[Cite as *State v. Nesbitt*, 2023-Ohio-3434.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 23CA14 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| Deshawn Nesbitt, | : | |
| | : | **RELEASED 9/25/2023** |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Cassandra S. Goodpaster, Assistant State Public Defender, Office of the Ohio Public Defender, Columbus, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.

_____

Hess, J.

**{¶1}** Deshawn Nesbitt appeals from a judgment of the Ross County Court of Common Pleas convicting him of felonious assault with a firearm specification and having weapons while under disability. Nesbitt presents four assignments of error in which he contends that the trial court erred in refusing to instruct the jury on negligent assault as a lesser included offense of felonious assault, that his conviction was against the manifest weight of the evidence, that the Reagan Tokes Law is unconstitutional, and that the having weapons while under disability statute is unconstitutional. For the reasons which follow, we overrule the assignments of error and affirm the trial court's judgment.

I. FACTS AND PROCEDURAL HISTORY

A. Pre-Trial Proceedings

{¶2} On August 6, 2021, an indictment was filed charging Nesbitt with two counts of felonious assault in violation of R.C. 2903.11, second-degree felonies, alleged to have occurred on or about July 17, 2021. He pleaded not guilty. On August 27, 2021, a second indictment was filed under the same case number charging Nesbitt with two counts of felonious assault in violation of R.C. 2903.11, second-degree felonies, and one count of having weapons while under disability in violation of R.C. 2923.13, a third-degree felony, all alleged to have occurred on or about July 17, 2021. Both of the new felonious assault counts included a firearm specification. Nesbitt pleaded not guilty to the second indictment.

## B. The Trial

{¶3} The matter proceeded to a jury trial at which the trial court and parties proceeded as if the second indictment was the only indictment, and the jury considered only the charges and specifications set forth in it.

### 1. Testimony of Austin Earles

{¶4} Austin Earles, age 19, testified that the night of July 16, 2021, he had a party at an unoccupied house which his father owns on Austin Road in Ross County. The unoccupied house is 0.2 or 0.3 miles from the house where they live. About 20 to 40 people came to the party, and Earles did not know about half of them, including Nesbitt. Earles testified that no one parked at the unoccupied house. He "had everybody go down the road" and park by the house where he lives, which sits across from a field his family uses for parking. People listened to music, drank, and played beer pong at the party. At some point, Earles became aware that an argument was happening but "did not directly see it." Earles later heard that Blake Detty and Nesbitt, also known as "Dae Dae," had a

dispute over a beer pong bet. People were yelling, and two people shoved Earles. Earles stood on a chair and announced that he was not going to be disrespected in his house and that if anyone had a problem, "the door is right there." Then "everybody" started arguing and fighting, the situation continued to escalate, and about half the people went outside.

{¶5}  Maybe two minutes later, Earles went outside onto the front steps after hearing screaming and seeing "punches being thrown." Earles saw his friend Connor Johnson "on the ground" with "three people on top of him." Earles tried to help, and someone punched him in the face. Earles pulled out his phone and started recording. Earles testified that there was someone five or six feet away from him, and "I seen [sic], you see in the video, him reaching down, picking up his gun and his clip, loading it and shooting it, straight up right past my head." The prosecutor asked if Earles "saw the gun come up," and Earles said, "Yes. That was not - - that was just the first kind of like a warning shot, I guess. I - - I'm not really sure. That was just the first one towards me." The prosecutor asked, "Did the gun come to you when you're filming?" Earles said, "Yeah, it was coming straight up at me and then I just felt it whistle by my face and I just - - I took off." The prosecutor asked Earles if "the person that pointed the gun at you and fired the gun at you" was in the courtroom, and Earles said, "Yes," and identified Nesbitt.

{¶6}  Earles testified that as soon as he heard the shot, he "took off" and went behind the house. He waited there for a couple of minutes during which he "heard a couple more shots." He went back to the front of the house and saw Tanner Chenault lying in the yard, bleeding "out of his head." Earles and Chloe Redden[1] called 911, and

---

[1] The first name of this individual is spelled Chloe and Chole in the trial transcript.

he spoke to dispatchers while she applied pressure to Chenault's head.  Earles testified that at the time of the first shot, Chenault "was not beside" him and was "over on the other side."  When asked if Chenault was "down" when Earles went behind the house, Earles testified:  "No, he was still - - I thought he was running away.  I don't know what happened.  I couldn't see, but I thought everybody was running when it - - when it happened.  I thought everybody was just going to dip."  Earles testified that he "drank a few beers" at the party and had a buzz but was not drunk.  Later, when asked again if he was drunk, he testified, "Yes and no.  It all, like, just went away as soon as it happened." Earles testified that Chenault had also been drinking.

### 2.  Testimony of Blake Detty

**{¶7}**    Blake Detty, age 19, testified that he arrived at the party in the evening and that he drank but was not drunk. He and a friend played a game of beer pong against Nesbitt, who Detty met that evening, and someone else. They had a $20 bet on the game, which Detty's team won. "There was a little bit of an argument" with "a few words exchanged," but the bet was paid, and the players "kind of split off."  Subsequently, Earles stood on a chair and told everybody to get out.  Nesbitt pulled out a gun and put it to Detty's chest without saying anything.  Detty "didn't know what to do" and went outside. When asked if he was present when shots were fired, Detty testified, "I watched it all happen."  But he testified that he did not remember much of what happened after he went outside because "everything went blank after I had a gun to my chest."

### 3.  Testimony of Michael Castle

**{¶8}**    Michael Castle, age 19, testified that he helped Earles and Detty set up for the party in the afternoon.  People were drinking and smoking pot at the party.  Castle

had about 10 beers and was "a little tipsy" but not "intoxicated fully." While talking to people outside, he heard a commotion in the house. He entered and saw people arguing and Earles "trying to get people to leave." The situation "turned into a big old altercation." After about 20 minutes, "everything got moved outside." Castle saw "everybody in a big group." A "couple people" got "a little physical," and Castle saw Chenault "getting held down on the ground." At some point, Castle heard a "boom," and "thought a firework went off." Then Castle "heard two more" and realized he was hearing gunshots, not fireworks.

{¶9} Before the first shot, Castle saw "everybody spacing apart" and Nesbitt, who he did not know prior to that night, "reach down and grab something." Castle was "pretty sure" it was a gun and testified that it looked like Nesbitt loaded a magazine and "that's when the first shot was fired." When asked what direction Nesbitt pointed the gun, Castle testified, "Well, he was standing with his back towards the house and shot it towards the road from where the house was." When asked if he saw Nesbitt "shoot it at anyone," Castle testified, "I seen - - I know by [sic] buddy Austin, there was a couple of other people around right there in that area and he just raised up and that's when I heard the first bang, and like I said, didn't know if it was that or a firework for sure. I didn't know at the time, but then I know I did see him lean down and grab something, but I'm not one hundred percent sure that's what it was at the time." Defense counsel asked Castle if he was able to see "well through that crowd of people." Castle testified, "Not really, no." Counsel then stated, "You just see somebody kind of go down and come back up." Castle testified, "Well, that and it didn't really click until I was right there when Tanner Chenault got grazed with a bullet. I was there. That's when it really clicked in." Castle testified that after the first shot, everyone "just kind of stopped" and "looked around to figure out what's going

on." After the second shot, everyone "started taking off," and Castle went into the woods. About five minutes later, Castle "came back to see what was going on" and saw Chenault lying on the ground.

### 4. Testimony of Chloe Redden

{¶10} Chloe Redden, age 19, testified that she was at the party and did not drink. She watched Detty and Nesbitt play a game of beer pong. They were casually "bickering back and forth" and made a $20 bet on the game. Detty won, and Detty and Nesbitt started arguing. Redden went out to her car which was "on the other side of the pine trees" located to the left of the house if one is facing it. There "was a long stretch down the road" with "cars lined up down there." Redden testified that she heard "the first gunshot" and "took back off to * * * where everyone else was." She "rounded the corner" and "watched Mr. Nesbitt shoot [Chenault] in the head." Chenault "did like a little twist and he just kind of fell." Redden testified that when Nesbitt shot Chenault, Nesbitt was "by the pine trees." Nesbitt ran away, and Redden went to Chenault and put her hand on his head to stop the bleeding. At one point, Redden testified that she did not "see the first couple of shots" but "did see the one that Tanner got shot." Later, she testified that she heard a total of two shots but did not "know how many actually went off."

### 5. Testimony of Tanner Chenault

{¶11} Tanner Chenault, age 20, testified that he arrived at the party "a little late" and "had a sip" of a drink but was not drunk. There were "kind of some arguments going on," which he was told started "over a pong game" that "there was money on." People were yelling, and Earles got on a table and told everyone that if they had a problem they needed to leave. Some guys they "didn't really know that had the problem" did not want

to leave and tried to pull Earles down. Then Johnson walked outside, and the guys followed him.  Chenault followed the guys to make sure they were leaving.  They started beating Johnson up. Chenault "tried to pull them apart, stop it." Someone hit him, and Chenault said, "I'm just trying to break it up." He got hit again and started defending himself.  Then there was "all kinds of fighting going on everywhere."  A girl got on his back and pulled him to the ground onto her; Chenault only knew it was a girl "cause the video."

{¶12}  Chenault testified that after he got up, Nesbitt, who he had attended junior high with for a month, "pulled a gun from the ground and started shooting, like, in the air or towards - - I think he was just trying to fire some, like warning shots, I believe."  Chenault testified that "Deshawn had got that gun and shot in the air" and that Nesbitt fired two or three shots "all at the same time pretty much."  However, Chenault admitted that he did not actually see Nesbitt get a gun and had "no idea" where Nesbitt was when Chenault heard the first shot.  Chenault testified, "I was really confused, when the shots went off.  I didn't even realize it was a gun shot."  Chenault also testified, "I don't know where he shot.  I just remember watching the video.  It was kind of aiming up."  Defense counsel asked, "Like in the air.  Like trying to scare people off at that point?" Chenault testified, "Yes."

{¶13}  Chenault testified that after the initial shots, "everybody started running," but he "was kind of just stuck" and "didn't know what to do."  Chenault testified, "Nobody was around and then me and Deshawn locked eyes and then he pulled the gun from his waistband again and started shooting at my way and that's when it hit me." Chenault testified that he saw Nesbitt point the gun at him and that Nesbitt fired two or three shots. Chenault testified, "I kind of like - - when I heard it fired off, I kind of ducked, and I'm not

sure which one hit me, the first, second, or the third, and I didn't even really notice it at first. I just felt my ears ringing really bad, and then blood started pouring down my face, and I just fell to the ground." When asked, "And you said that he pointed the gun at you and you kind of ducked down," Chenault testified, "After he shot, yeah." And when asked, "You heard the gunshot and you kind of ducked down," he testified, "Yeah." Chenault testified that when he and Nesbitt locked eyes, Chenault was standing beside a tree about five yards from the house. Nesbitt was "maybe 10 yards" away from him "by a bush out by the - - the road" in an area where there were also trees. When asked how much time elapsed between "the first shot and then the shot at [him]," Chenault testified, "A minute, 30 seconds." Chenault thought he passed out after being shot.

### 6. Additional Testimony

{¶14} Three members of law enforcement who responded to the scene testified. Pertinent here, Officer Thomas Hamman of the Ross County Sheriff's Office testified that a witness showed him a video, and he "could tell from the video that the shot was fired in the proximity of the house" by the front stoop. He started a search there and "worked [his] way out." He found a fired, 40 caliber shell casing from a semi-automatic weapon about 18 to 24 inches from the front stoop. Officer Hamman testified that it was dark when he was at the scene, and when he arrived, it was getting "ready to storm." Within 45 minutes of his arrival, a storm with "heavy rain" occurred, and it was still raining when law enforcement cleared the scene.

{¶15} Detective Kevin Pierce of the Ross County Sheriff's Office testified that when he arrived, it was raining so hard that "you couldn't even get out of your car without getting soaked." He was advised that the initial responders to the scene had collected

"what they could and couldn't find anything else."  Detective Pierce also testified that he interviewed Chenault at the hospital and observed a bandage on the left side of his head which "had dried blood on the side."

**{¶16}** Earles's father testified that on October 4, 2021, he was mowing at the unoccupied house and hit a log with his mower.  He "budged the log and pushed some weeds back," and "a gun surfaced."  There was rust on it, as if "it had been sitting out for awhile," and there was a magazine in it.  He used a handkerchief to pick the gun up and gave it to a detective the next day.  The gun was a 40 caliber semi-automatic pistol.

**{¶17}** Detective Pierce testified that he collected the gun.  He was "able to release the magazine and then after several efforts, get the slide to the rear to make sure that the weapon was safe."  He found one spent casing lodged in the barrel. Detective Pierce testified that when a semi-automatic pistol is fired, the spent casing is ejected, and the gun chambers another round.  The fact that a spent casing was lodged in the barrel of the gun indicated it did not successfully cycle the round.  Detective Pierce did not know whether the ammunition in the gun matched the shell casing found at the scene.

**{¶18}** Katherine Dailey, a forensic scientist at the Ohio Bureau of Criminal Investigation ("B.C.I.") tested a swab from the gun's trigger and found no D.N.A. profile on it. She tested a swab from the slide and found that the D.N.A. profile on it was insufficient for comparison. Dailey testified that she did not test additional swabs from other parts of the gun pursuant to B.C.I. policy because those areas were less likely to have been handled.  She testified that law enforcement could have requested that those swabs be tested anyway but did not do so.

## 7. Exhibits

**{¶19}** The state introduced into evidence several exhibits, including the video Earles took. At the beginning of the footage, people are talking excitedly and a male can be seen on the ground, lying partially on top of a female who has her arms wrapped around his neck. After a few seconds, Nesbitt can be seen with his back to the house. He bends down and appears to be loading a gun. He stands up with it in his right hand. There is a point where the gun might be pointing upward, before it moves off camera before the gunshot. Shortly before the gunshot, Nesbitt's right elbow is bent and pointed toward the ground. After the gunshot, someone screams, the camera pans toward the ground, and the video ends.

**{¶20}** The state's exhibits also include Chenault's medical records from Adena Regional Medical Center from July 17, 2021. The records state Chenault reported no alcohol use but also state that he reported having one "JACK AND DR PEPPER" and appeared intoxicated. The records also indicate Chenault did not lose consciousness and that an examination of his head showed "[e]vidence of penetrating injury to the left occipital scalp."

**{¶21}** In addition, the state's exhibits include a February 2020 judgment entry which indicates Nesbitt was adjudicated a delinquent child by reason of having committed an act which would be felonious assault, a second-degree felony, if committed by an adult. Nesbitt stipulated that he had been adjudicated of an offense which prohibited him from acquiring, having, carrying, or using a firearm and that he had not been relieved from the disability.

### 8. Jury Instructions and Verdict

**{¶22}** Nesbitt requested a jury instruction on negligent assault as a lesser included offense of the felonious assault counts, and the court denied the request. The court instructed the jury that the first felonious assault count pertained to Chenault and that the second count pertained to Earles. The jury found Nesbitt not guilty of the felonious assault count which pertained Earles. The jury found Nesbitt guilty of the felonious assault count which pertained to Chenault and the accompanying firearm specification and found Nesbitt guilty of having weapons while under disability.

### C. Sentencing and Appeals

**{¶23}** The trial court imposed an aggregate sentence of 13.5 to 17.5 years in prison. Nesbitt filed an appeal which we dismissed for lack of a final, appealable order because the trial court did not dispose of the counts in the first indictment via journal entry. *State v. Nesbitt*, 4th Dist. Ross No. 22CA20, 2023-Ohio-1276, ¶ 1. Subsequently, the trial court dismissed the first indictment and issued an amended judgment entry of sentence noting that fact. This appeal followed.

## II. ASSIGNMENTS OF ERROR

**{¶24}** Nesbitt presents four assignments of error:

ASSIGNMENT OF ERROR NO. 1: The trial court erred in refusing to instruct the jury on negligent assault when the evidence showed that the defendant, at most, acted recklessly when handling the firearm, but not knowingly, and recklessness is sufficient culpability for negligent assault but not for felonious assault.

ASSIGNMENT OF ERROR NO. 2: Nesbitt's conviction was against the manifest weight of the evidence as the jury clearly lost its way in rendering a guilty verdict.

ASSIGNMENT OF ERROR NO. 3:  R.C. 2967.271, the Reagan Tokes Law, violates Article I, Section 5 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the Constitution of the United States.

ASSIGNMENT OF ERROR NO. 4:  R.C. 2923.13, the weapons-under-disability statute that allows a juvenile adjudication to serve as a predicate offense for an adult felony conviction, violates Article I, Section 5 of the Ohio Constitution and the Sixth Amendment to [the] Constitution of the United States.

### III.  JURY INSTRUCTIONS

{¶25}  In the first assignment of error, Nesbitt contends that the trial court erred in refusing to instruct the jury on negligent assault as a lesser included offense of felonious assault.  Nesbitt asserts that the court erred in not recognizing that recklessness satisfies the mens rea requirement for negligent assault and that the court "should have reviewed the evidence to determine whether there was sufficient evidence that [he] acted recklessly."  Nesbitt also claims that the trial court failed to view the evidence in a light most favorable to him.  He asserts that the court should have considered whether there was sufficient evidence to allow a jury to reasonably reject the felonious assault offense and not whether there was sufficient evidence for the jury to convict him of that offense.  He asserts that the evidence shows he "at most, acted recklessly" and not knowingly, the mens rea for felonious assault.

{¶26}  Nesbitt highlights the fact that eyewitnesses gave conflicting testimony about the number of gunshots and asserts that the "physical evidence" does not match their testimony.  He suggests only one shot was fired, i.e., the shot heard on the video footage, because law enforcement only found one shell casing at the scene. Nesbitt asserts he fired that shot straight up into the air, which is reckless.  Nesbitt claims the trial court incorrectly stated that the video footage showed him firing into a crowd.  Nesbitt

claims the footage shows him "as he raised a gun and shot straight up into the air," and Earles and Chenault gave testimony to that effect. Nesbitt also contends that even if the gun found in the yard was used during the shooting, which is "highly suspect," "only two shots would have been fired" because "the gun would have been rendered inoperable after the second shot when the round caught in the chamber." Nesbitt asserts that him "firing the 'warning shots' into the air, as Chenault testified to, would have spent both rounds, making it impossible for Nesbitt to fire any more shots."

{¶27} Nesbitt claims that Chenault's testimony about locking eyes with Nesbitt and ducking after Nesbitt shot at him is incredible. Nesbitt contends that medical records indicate that Chenault "was grazed in the back of the head" because the records describe an injury to his "left occipital scalp." Nesbitt asserts that Chenault could not have been facing him and "miraculously ducked and turned faster than a bullet moves straight through the air," especially if Chenault was impaired by alcohol. Nesbitt also asserts that the only evidence tying him "to the incident involving Tanner Chenault" is the testimony of Chenault and Redden, and that inconsistencies in their testimony provided "sufficient evidence for the jury to reasonably reject that [he] knowingly shot at Chenault."

### A. Legal Principles

{¶28} "When the indictment * * * charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense." R.C. 2945.74; *see also* Crim.R. 31(C). "The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis." *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722,

989 N.E.2d 986, ¶ 6. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense." *Id.*, quoting *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987). In making this determination,

> a court shall consider whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed.

*State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, paragraph two of the syllabus, clarifying *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988).

{¶29} "The second tier looks to the evidence in a particular case and determines whether ' "a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." ' " *Deanda* at ¶ 6, quoting *Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶ 11. "The trial court has discretion in determining whether the record contains sufficient evidentiary support to warrant a jury instruction on the lesser-included offense, and we will not reverse that determination absent an abuse of discretion." *State v. Blanton*, 2018-Ohio-1278, 110 N.E.3d 1, ¶ 64 (4th Dist.). However, while "the discretion of the trial judge play[s] a role in whether lesser-included-offense instructions are appropriate * * * the evidence is crucial[.]" *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, ¶ 21. " '[T]he trial court must view the evidence in the light most favorable to the defendant.' " *Id.*, quoting *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37. An instruction on a lesser included offense "is not warranted every time 'some evidence' is presented to support the lesser offense." *State*

*v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 192, citing *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992).  "Rather, a court must find 'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.' " (Emphasis in *Shane*) *Id.*, quoting *Shane* 632-633.  "The trial court must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense."  *Wine* at ¶ 34.

### B.  Statutory Provisions

{¶30}  Because Nesbitt was acquitted of the felonious assault count regarding Earles, we focus our analysis on the count involving Chenault.  Nesbitt was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which states: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."  The trial court instructed the jury that the "state charges that the acts of" Nesbitt "caused physical harm to" Chenault.

{¶31}  R.C. 2901.22(B) defines the mental state of knowingly:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist.  When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶32}  R.C. 2903.14(A), the negligent assault statute, states:  "No person shall negligently, by means of a deadly weapon or dangerous ordnance as defined in section

2923.11 of the Revised Code, cause physical harm to another * * *."  R.C. 2901.22(D)

states:

> A person acts negligently when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that the person's conduct may cause a certain result or may be of a certain nature.  A person is negligent with respect to circumstances when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that such circumstances may exist.

**{¶33}**  "When the section defining an offense provides that negligence suffices to

establish an element thereof, then recklessness, knowledge, or purpose is also sufficient

culpability for such element." R.C. 2901.22(E).  Thus, recklessness is sufficient culpability

to satisfy the negligence element of R.C. 2903.14(A).  R.C. 2901.22(C) states:

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

### C.  First Tier

**{¶34}**  Negligent assault is a lesser included offense of felonious assault under

R.C. 2903.11(A)(2) "as statutorily defined in the alternative of causing physical harm."

*State v. Danko*, 9th Dist. Medina No. 07CA0070-M, 2008-Ohio-2903, ¶ 46.  Felonious

assault carries a greater penalty than negligent assault.  *See* R.C. 2903.11(D)(1)(a)

(felonious assault is generally a second-degree felony); R.C. 2929.14(A)(2)(a) (second-

degree felony committed on or after March 22, 2019, subject to minimum prison term of

two years); R.C. 2903.14(B) (negligent assault is a third-degree misdemeanor); R.C.

2929.24(A)(3) (third-degree misdemeanor subject to jail term not to exceed 60 days).

When felonious assault under R.C. 2903.11(A)(2) involves causing physical harm, an

element of that offense, i.e., that the defendant acted knowingly, is not required to prove negligent assault. In addition, the offense of felonious assault as statutorily defined could not be committed without the lesser offense of negligent assault as statutorily defined also being committed. *See Danko* at ¶ 46 ("it would be impossible to commit felonious assault (knowingly causing physical harm by means of a deadly weapon) without also committing negligent assault").

### D. Second Tier

**{¶35}** The trial court used the correct standard for the second tier of the analysis. The court explained a negligent assault instruction was required if the evidence "reasonably permits both an acquittal on felonious assault and conviction on negligent assault," which is what the court had to consider under the second tier. *See Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, at ¶ 6. The court then stated that a negligent assault instruction was not required "because there is sufficient evidence from which the jury could have convicted this defendant of felonious assault," which is not the standard. However, the court went on to apply the correct standard, finding that "there is not sufficient evidence in this case to reasonably permit both an acquittal on felonious assault and conviction on negligent assault."

**{¶36}** It is true that the trial court did not explicitly address the fact that pursuant to R.C. 2901.22(E), recklessness is sufficient culpability to satisfy the mens rea element of negligent assault. However, Nesbitt's trial counsel did not raise the issue. And viewing the evidence in a light most favorable to Nesbitt, the jury could not have reasonably found him not guilty of felonious assault but guilty of negligent assault, even based on a theory of recklessness.

{¶37} The evidence does not support the conclusion that Nesbitt fired a single shot straight up into the air which struck Chenault.   It is not reasonable to infer that only one shot, i.e., the shot heard on the video footage, was fired solely because law enforcement only found one shell casing at the dark and rainy scene.   All the other evidence indicates Nesbitt fired a minimum of two shots.  And even if Nesbitt fired the first shot straight up into the air, the evidence indicates that Chenault was not struck by the first shot.  Earles testified that he did not think Chenault was "down" after the first shot, when Earles ran behind the house.  Redden testified that she heard two shots and that the second struck Chenault.  Chenault testified that there were initially two to three shots, that Nesbitt later fired two to three more shots in his direction, and that the bullet which struck Chenault came from the second round of shots.

{¶38} Even if a total of two shots were fired, there is no evidence Nesbitt fired the second shot, which would have been the one which struck Chenault, straight up into the air.  Redden testified that she saw the second shot and "watched Mr. Nesbitt shoot [Chenault] in the head"—not that she watched Nesbitt shoot the gun straight up into the air.   And contrary to what Nesbitt asserts, under a two-shot scenario, Chenault's testimony would not support the conclusion that Nesbitt fired the second shot straight up into the air.  Although Chenault gave testimony about Nesbitt initially firing warning shots into the air, Chenault later indicated that his testimony about the position of the gun was not based on his personal observations but rather was based on his review of the video footage.   The video footage ends before the second shot is fired, and Chenault unequivocally testified that he saw Nesbitt point the gun at him before Nesbitt fired the shot which struck him.  And even if the jury found Redden and Chenault's testimony

unbelievable and concluded the state failed to prove Nesbitt acted knowingly, Chenault and Redden lying about seeing Nesbitt shoot at Chenault would not be evidence that Nesbitt fired the bullet which struck Chenault straight up into the air.

{¶39} There is no reasonable view of the evidence under which it was possible for the jury to find Nesbitt not guilty of felonious assault against Chenault but guilty of negligent assault against him. Therefore, the trial court did not err in refusing to instruct the jury on negligent assault as a lesser included offense of felonious assault. We overrule the first assignment of error.

## IV. MANIFEST WEIGHT OF THE EVIDENCE

{¶40} In the second assignment of error, Nesbitt contends that his "conviction was against the manifest weight of the evidence as the jury clearly lost its way in rendering a guilty verdict." Nesbitt asserts that the eyewitnesses were 18 or 19 years old at the time of the incident and that their ability "to accurately perceive and recall events" was "marred by alcohol and marijuana." Nesbitt asserts that the eyewitnesses were friends and "had a year to ruminate on the events of that night and share stories and theories." He claims that "[h]alf of the testimony seems to be the product of a year of discussion about what must have happened at that party, while the rest of the testimony is the struggle of each witness to fit their own memories around that story." Nesbitt maintains that there is inconsistent evidence with respect to "every aspect of the party," such as where people parked, how much people drank, how the fight started, how many shots were fired, the time between shots, where Nesbitt was when the shots were fired, and where Chenault was looking before he was injured. Nesbitt also directs our attention to testimony which he asserts indicates witnesses were testifying based on "gossip and hearsay" or what

they saw in the video footage instead of personal knowledge. Nesbitt maintains that "[a]ll of the testimony" was incredible and unreliable. He asserts that "not only did the State fail to present 'substantial credible evidence' that [he] knowingly shot at Chenault, * * * but the physical evidence collected at the scene of the crime does not match the State's theory nor the testimony of its witnesses."

{¶41} In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. However, we are reminded that generally, it is the role of the jury to determine the weight and credibility of evidence. " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.

(Citations omitted.) *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 14-15.

{¶42} As previously stated, Nesbitt was convicted of the felonious assault of Chenault in violation of R.C. 2903.11(A)(2), which states: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." He was also convicted of having weapons while under disability

in violation of R.C. 2923.13(A)(2), which states: "(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply: * * * (2) The person * * * has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence."

{¶43} After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse Nesbitt's convictions. Initially, we observe that it is unclear whether Nesbitt is challenging his having weapons under disability conviction under the third assignment error. To the extent he is, such a challenge is not well-taken. The state presented evidence that Nesbitt was adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence, i.e., felonious assault, a second-degree felony. Nesbitt stipulated that he had been adjudicated for an offense which prohibited him from acquiring, having, carrying, or using a firearm and that he had not been relieved from the disability. And the jury could conclude that he knowingly acquired, had, carried, or used a firearm based on the video footage and eyewitness testimony.

{¶44} With respect to the felonious assault conviction, the state presented evidence that Nesbitt knowingly caused physical harm to Chenault by means of a deadly weapon. It is true that there are some inconsistencies in the evidence and that some witnesses, including Chenault, gave testimony, without objection, which was not based on their personal knowledge. However, Chenault unequivocally testified that he saw

Nesbitt point a gun at him and fire it, and Redden unequivocally testified that she watched Nesbitt shoot Chenault in the head.

{¶45} This testimony is not inherently incredible. Although Chenault, Redden, and other eyewitnesses had different recollections about the exact number of shots fired, they were involved in a traumatic event. All the eyewitnesses who testified about the number of shots agreed that at least two shots were fired. Chenault and Redden agreed that Chenault was not struck by the first shot and that Nesbitt was standing in an area near trees when he fired the shot which struck Chenault, though Chenault also recalled a bush. And contrary to what Nesbitt suggests, it was not impossible for him to change locations between the first shot and shot which struck Chenault. Chenault testified that the first round of shots he heard was fired "all at the same time pretty much." He testified that he was struck during the second round of shots, and when asked how much time elapsed between "the first shot and then the shot at [him,]" he testified, "A minute, 30 seconds." Redden, who heard two shots, indicated that between the first and second shot, she travelled from her car back to the house. Thus, Redden and Chenault both indicated there was a gap in time between the first shot and the shot which struck Chenault.

{¶46} Nesbitt's suggestion that Chenault is incredible because there is evidence that he drank more than he testified and "could not possibly have seen Nesbitt shoot him if he was hit in the back of the head" is not well-taken. The jury had no obligation to find that Chenault was so impaired by alcohol that he could not reliably recall what happened in the moments before he was shot. Moreover, there is not enough evidence for us to conclude that it was impossible for Chenault to have seen Nesbitt point the gun at him before he sustained his head injury.

{¶47} Even if Chenault was lying or mistaken about seeing Nesbitt point the gun at him, Redden testified that she was not drinking and watched Nesbitt shoot Chenault in the head. Contrary to what Nesbitt suggests, the jury was free to believe this testimony regardless of any inconsistency between the testimony of Redden and Earles about the precise location where partygoers parked their vehicles. For the foregoing reasons, we conclude that Nesbitt's convictions were not against the manifest weight of the evidence, and we overrule the second assignment of error.

## V. CONSITUTIONALITY OF REAGAN TOKES LAW

{¶48} In the third assignment of error, Nesbitt contends that "R.C. 2967.271, the Reagan Tokes Law, violates Article I, Section 5 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the Constitution of the United States."

### A. Statutory Provisions

{¶49} The Reagan Tokes Law encompasses 4 newly enacted statutes and amendments to 50 statutes. R.C. 2901.011. The law requires that a court imposing a prison term under R.C. 2929.14(A)(1)(a) or (2)(a) for a first or second-degree felony committed on or after March 22, 2019, impose a minimum prison term under that provision and a maximum prison term determined under R.C. 2929.144(B). R.C. 2929.144(A) and (C). There is a presumption that the offender "shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C. 2967.271(B). A presumptive earned early release date is a date determined under procedures described in R.C. 2967.271(F) which allow the sentencing court to reduce the minimum prison term under certain circumstances. R.C. 2967.271(A)(2).

**{¶50}** R.C. 2967.271(C) states that the department of rehabilitation and correction ("DRC") may rebut the presumption in R.C. 2967.271(B) if it determines, at a hearing, that one or more of the following applies:

(1) Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:

(a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated.

(b) The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender continues to pose a threat to society.

(2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

(3) At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

If DRC rebuts the presumption, it "may maintain the offender's incarceration" after the expiration of the minimum prison term or presumptive earned early release date for a reasonable period, determined and specified by DRC, which "shall not exceed the offender's maximum prison term." R.C. 2967.271(D)(1).

### B. Standard of Review

**{¶51}** The constitutionality of a statute presents a question of law we review de novo. *Hayslip v. Hanshaw*, 2016-Ohio-3339, 54 N.E.3d 1272, ¶ 27 (4th Dist.). " '[L]aws are entitled to a strong presumption of constitutionality.' " *Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Commt.*, 154 Ohio St.3d 86, 2018-Ohio-3220, 111

N.E.3d 1139, ¶ 26, quoting *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16. "A party may challenge a statute as unconstitutional on its face or as applied to a particular set of facts." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37. Nesbitt asserts a facial challenge to the Reagan Tokes Law and therefore "must prove beyond a reasonable doubt 'that no set of circumstances exists under which the act would be valid.' " *Ohio Renal Assn.* at ¶ 26, quoting *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 21.

{¶52} As the state points out, Nesbitt did not challenge the constitutionality of the Reagan Tokes Law at the trial level. " '[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.' " *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15, quoting *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). A reviewing court does have "discretion to consider a forfeited constitutional challenge to a statute" and "may review the trial court decision for plain error, but we require a showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." (Citation omitted.) *Id.* at ¶ 16. "The burden of demonstrating plain error is on the party asserting it." *Id.* The Supreme Court of Ohio has "stated that a forfeited constitutional challenge to a statute is subject to review 'where the rights and interests involved may warrant it.' " *Id.*, quoting *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus.

C. Analysis

**{¶53}** Nesbitt did not argue plain error on appeal, and we decline to construct a plain error argument on his behalf. *State v. Conant*, 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, at ¶ 40 (declining to construct plain error argument for appellant challenging Reagan Tokes Law). However, we observe that even if Nesbit had argued plain error, his argument would fail. Nesbitt asserts the Reagan Tokes Law violates the right to a jury trial and separation-of-powers doctrine, but in *State v. Hacker*, ___ Ohio St.3d ___, 2023-Ohio-2535, ___ N.E.3d ___, the Supreme Court of Ohio recently held that the law does not violate the right to a jury trial or the separation-of-powers doctrine. *Hacker* at ¶ 1, 25, 28. "An appellate court has no authority to overrule decisions of the Ohio Supreme Court but is bound to follow them." *State v. Dickens*, 9th Dist. Lorain No. 07CA009218, 2008-Ohio-4404, ¶ 25.

**{¶54}** Nesbitt also asserts that the Reagan Tokes Law violates the right to due process under the Fourteenth Amendment. He claims that the law "does not give adequate notice of what will trigger additional prison time" because R.C. 2967.271(C) is unconstitutionally vague regarding what institutional rule infractions DRC may use to rebut the R.C. 2967.271(B) presumption of release. However, *Hacker* held that the Reagan Tokes Law is not void for vagueness. *Hacker* at ¶ 40. Nesbitt also claims the Reagan Tokes Law "does not provide a process for a fair hearing" when rule infraction "charges are brought." He asserts that under Ohio Adm.Code 5120-9-08, a panel of two DRC staff members has authority to determine guilt, the panel has "ultimate authority" to grant or deny requests for witnesses, and if the panel grants a request, the inmate "may not address or examine a witness" and "is only permitted to ask the panel to pose

questions to the witness." However, *Hacker* determined that the Reagan Tokes Law does not violate procedural due process on its face. *Hacker* at ¶ 1, 35-40. To the extent Nesbitt suggests Ohio Adm.Code 5120-9-08 is unconstitutional, that argument is beyond the scope of the third assignment of error, so we need not address it. *See State v. Nguyen*, 4th Dist. Athens No. 14CA42, 2015-Ohio-4414, ¶ 41 (an appellate court reviews "assignments of error and not mere arguments").

**{¶55}** For the foregoing reasons, we reject the contention that the Reagan Tokes Law is unconstitutional and overrule the third assignment of error.

## VI.  CONSTITUTIONALITY OF R.C. 2923.13

**{¶56}** In the fourth assignment of error, Nesbitt contends R.C. 2923.13, the having weapons while under disability statute, violates Article I, Section 5 of the Ohio Constitution and the Sixth Amendment of the United States Constitution because it allows a juvenile adjudication to serve as a predicate offense for an adult felony conviction. Nesbitt quotes the following statement in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.E.2d 435 (2000): "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." He asserts that in *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, the Supreme Court of Ohio held that a juvenile adjudication may not be used as a sentencing enhancement under *Apprendi* because there is no right to a jury trial in juvenile proceedings. Nesbitt acknowledges that in *State v. Carnes*, 154 Ohio St.3d 527, 2018-Ohio-3256, 116 N.E.3d 138, the Supreme Court of Ohio held that R.C. 2923.13 does not offend due process because it does not use a juvenile adjudication as a sentencing enhancement. However, Nesbitt claims "*Carnes*

reads *Apprendi* and its progeny too narrowly" and that "[w]hen a juvenile adjudication is used as the sole element of a crime committed as an adult to secure a conviction, a defendant's right to a jury trial is violated, and the conviction must be reversed."

**{¶57}** Again, the constitutionality of a statute presents a question of law we review de novo. *Hayslip*, 2016-Ohio-3339, 54 N.E.3d 1272, at ¶ 27. However, as the state points out, Nesbitt did not raise a constitutional challenge to R.C. 2923.13 at the trial level and has therefore forfeited all but plain error. *Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, at ¶ 16. Nesbitt has not argued plain error on appeal, and we decline to construct a plain error argument on his behalf. *Conant*, 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, at ¶ 40 (declining to construct plain error argument on appellant's behalf). However, to the extent Nesbitt asks this court to vacate his conviction for having weapons while under disability on the ground that *Carnes* was wrongly decided, we again observe that "[a]n appellate court has no authority to overrule decisions of the Ohio Supreme Court but is bound to follow them." *Dickens*, 9th Dist. Lorain No. 07CA009218, 2008-Ohio-4404, at ¶ 25.

**{¶58}** For the foregoing reasons, we overrule the fourth assignment of error.

VII. CONCLUSION

**{¶59}** Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
          Michael D. Hess, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**