[Cite as *State v. Platt*, 2024-Ohio-1330.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

STATE OF OHIO,                                    :

Plaintiff-Appellant,      :      Case No.  22CA2

v.                                    :

DONALD E. PLATT,                       :      DECISION AND
JUDGMENT ENTRY

Defendant-Appellee.        :

_____

Patrick T. Clark and Jared T. Strubel, Assistant State Public
Defenders, Columbus, Ohio, for appellant.

Keller J. Blackburn, Athens County Prosecuting Attorney, and
Merry M. Saunders, Athens County Assistant Prosecuting Attorney,
Athens, Ohio, for appellee.

_____

CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:4-2-24
ABELE, J.

{¶1}     This is an appeal from an Athens County Common Pleas Court judgment of conviction and sentence.  A jury found Donald Platt, defendant below and appellant herein, guilty of (1) involuntary manslaughter, in violation of R.C. 2903.04(A), and (2) endangering children, in violation of R.C. 2919.22(A).  The trial court merged the endangering children offense with the involuntary manslaughter offense and sentenced appellant to serve an indeterminate four- to six-year prison term.

{¶2}     Appellant assigns the following errors for review:

ATHENS, 22CA2

FIRST ASSIGNMENT OF ERROR:

"DONALD PLATT'S CONVICTIONS FOR CHILD ENDANGERMENT AND INVOLUNTARY MANSLAUGHTER ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE."

SECOND ASSIGNMENT OF ERROR:

"MR. PLATT WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW BY THE ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE AT TRIAL."

THIRD ASSIGNMENT OF ERROR:

"MR. PLATT WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW BY THE ADMISSION OF IMPROPER OPINION TESTIMONY."

FOURTH ASSIGNMENT OF ERROR:

"DONALD PLATT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."

FIFTH ASSIGNMENT OF ERROR:

"THE CUMULATIVE EFFECT OF THE FIRST, SECOND, THIRD, AND FOURTH ASSIGNMENTS OF ERROR DENIED DONALD PLATT A FAIR TRIAL."

SIXTH ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN IT SENTENCED DONALD PLATT TO AN INDETERMINATE TERM OF INCARCERATION UNDER THE UNCONSTITUTIONAL R.C. 2929.144."

ATHENS, 22CA2

On March 5, 2021, a childhood sleepover turned tragic when appellant's 14-year-old son, M.P., took a loaded weapon from an unlocked gun cabinet and accidentally shot and killed 11-year-old E.S., a friend of appellant's 11-year-old son, L.P.

{¶4} An Athens County Grand Jury subsequently returned an indictment that charged appellant with three offenses: (1) involuntary manslaughter, in violation of R.C. 2903.04(A); (2) endangering children, in violation of R.C. 2919.22(A); and (3) tampering with evidence, in violation of R.C. 2921.12(A)(1). The indictment also contained firearm specifications for the involuntary manslaughter and endangering children offenses. The state later dismissed the tampering with evidence charge.

{¶5} At the February 22, 2022 jury trial, the state's first witness, L.P., testified that on March 5, 2021, he, E.S., and M.P. generally were "hanging out" in L.P.'s and M.P.'s bedrooms. L.P. described the crime scene photographs to explain the layout of the bedrooms and to describe E.S.'s location when M.P. accidentally discharged the fatal shot. Several weapons also appeared within these photographs. One photograph showed "katanas" leaning against the bed. L.P. stated that katanas are swords "that Japanese Samorides [sic] used." At one point, L.P.

had a 20-gauge shotgun in his room that hung above his mirror.

He and M.P. also have throwing stars that they received from

their grandfather. Apparently, the boys did throw the stars at

the wall, but their parents yelled when they did so. Another

photograph showed L.P. with the barrel of a BB gun in his mouth.

{¶6} L.P. also recorded some videos of the evening's

activities. One video showed M.P. "vaping," while another

depicted L.P. telling E.S. to "kill" himself.[1] L.P. explained

that, as part of the evening's activities, he and E.S. sprayed

body spray on M.P.'s clothes, "lit it on fire and smacked it

out" "to mess with [M.P.]."

{¶7} L.P. also stated that, later in the evening, the three

boys went for a walk and, when they returned, they played video

games. The boys also discussed guns and visited appellant's

bedroom where appellant showed the boys a "pistol." Later, M.P.

retrieved a gun from the gun cabinet to show E.S. "the laser

[sight] on the gun." As M.P. showed E.S the gun, M.P dropped

---

The state played multiple videotaped recordings for the jury. However, none of the audio has been transcribed for the record. *See State v. Everette*, 129 Ohio St.3d 317, 2011-Ohio-2856, 951 N.E.2d 1018, ¶ 18-22 (explaining that transcript must be in writing and pointing out that videotape transcripts are not acceptable). This court nevertheless reviewed the recordings and has considered them to the extent that the content of the spoken words is obvious.

the gun. When M.P. picked up the gun, the gun discharged and the bullet struck E.S. L.P. called 9-1-1.

{¶8} M.P. testified that on the evening of March 5, 2021, he, L.P., and E.S. were "hanging out." The state introduced crime-scene photographs of M.P.'s bedroom and he indicated that one photograph depicted "a broken gun" that leaned against his dresser. M.P. further explained that, throughout the evening, he exchanged text messages with his girlfriend. After L.P. and E.S. lit his clothing on fire, he texted his girlfriend to report that L.P. and E.S. "just lit me on fire and snorted chocolate milk stuff." He elaborated that L.P. and E.S. "took like Axe and sprayed it on like my pant leg when I wasn't paying attention to it and took a lighter to it." M.P. further stated, "And for some reason [L.P. and E.S.) decided to snort chocolate milk batter."

{¶9} M.P. also sent his girlfriend text messages about vaping. One text stated that he "shot my little vape," and another stated he will "have to use dabs I guess." M.P. explained that "dabs" are "like a wax with THC in it."

{¶10} Later, M.P., E.S., and L.P. were in L.P.'s room and talked about guns "and like attachments that you can put on the guns." M.P. stated that he decided to show them appellant's gun that had the laser sight. M.P. went to the gun cabinet and,

although appellant usually locked the gun cabinet, this night M.P. found the gun cabinet unlocked. M.P. retrieved the gun and took it to the bedroom, and he showed them the gun, he "kind of like dropped it and then when I was picking it back up it almost dropped again and I kind of liked squeezed and, uh" the bullet struck E.S. M.P. explained that he "kind of like was in shock that it was loaded." He said that appellant "usually" leaves the guns unloaded, unless he was preparing to take the boys to the gun range. M.P. stated that he would not have "gotten the gun out" and shown it to E.S. if he knew that it had been loaded.

{¶11} On cross-examination, M.P. stated that his father talked to him about gun safety and told him to presume that "every gun is loaded." He agreed he "was being very stupid" the night he accidentally shot E.S.

{¶12} The trial court also allowed the jury to ask questions. The jury asked if M.P. knew when the picture was taken of L.P. with the BB gun. M.P. did not know. The jury also asked, "What are the effects of using dabs?" M.P. stated, "you just get high[;] that's all I know."

{¶13} Some law enforcement officers who responded to the scene testified and the state played videotaped recordings from

ATHENS, 22CA2

the officers. In the recordings, appellant can be heard exclaiming that he unlocked the gun cabinet "yesterday."

{¶14} Nelsonville Police Officer Justin Yocum stated that when he entered the Platt residence, he smelled marijuana. He did not, however, determine who may have smoked marijuana.

{¶15} Nelsonville Police Chief Scott Fitch testified about the weapons that he stores at his home. He explained that he stores weapons unloaded, and inside a gun safe that requires a combination and code. Fitch also stated that a gun cabinet and a gun safe are not the same. He indicated that a gun cabinet, like the one in appellant's home, is more decorative with windows and primarily is used to display weapons.

{¶16} On cross-examination, Chief Fitch agreed that Ohio law does not require gun owners to store weapons in a particular manner. Nevertheless, he believes that the steps he takes are the "responsible thing to do."

{¶17} Alexis Gogle, a data analyst with the Athens County Prosecutor's Office, testified about cell-phone data she extracted from the Platt family's electronic devices. On December 25, 2020, appellant communicated with someone about Christmas and stated that "Christmas is going so far, so good. No one is dead yet. You know with my two boys it's possible." He next states, "And they have guns and swords and shit. What

ATHENS, 22CA2

am I thinking.  Lol."  The person he corresponded with stated, "Holy shit.  Guns and swords.  You trying to get them to kill each other?  LMAO."

{¶18}  On February 5, 2021, M.P. sent appellant the message L.P.  "hit me with his stick thing [and] then swung katanas at me so I slapped him."  Appellant responded, "Y'all need to go to [your] own rooms[.]  I'll be home shortly."  Gogle also discovered that the photo of L.P. with the gun in his mouth was taken February 22, 2021.

{¶19}  Gogle also examined the electronic data from the evening of the fatal shooting to help create a time line of events.  She outlined the series of text messages that M.P. exchanged with his girlfriend, including messages about L.P. and E.S. setting his clothing on fire, vaping, and using "dabs." Gogle further testified about the electronic data that had been recorded near the estimated time of the shooting.  On March 6, 2021, at 12:27 a.m., L.P. used his phone to record himself and E.S., and "he repeats the phrase a few times kill yourself E.S., kill yourself."  A 12:35 a.m. video showed M.P. vaping.  At 12:42 a.m., M.P. called his girlfriend.  At 12:48 a.m., L.P. used M.P.'s phone to call 9-1-1.

{¶20}  Appellant testified in his defense.  When defense counsel asked appellant if he recalled the prosecutor showing

ATHENS, 22CA2

the jury a picture of L.P. with a gun in his mouth, appellant responded he did remember and "that was the first [he] had ever seen that." Defense counsel also asked appellant about the boys' swords and appellant reported that the swords "are blunt." Appellant did agree that M.P. once had a sharp sword, but appellant removed it the night the boys texted him about their argument. Appellant further stated that M.P. had a throwing star, but he is not sure how he obtained it.

{¶21} Defense counsel also asked appellant about M.P.'s text message regarding "dabs." Appellant stated that M.P. had a blood test the night of E.S.'s death, and appellant "was under the impression that if [M.P.] failed the blood test that night he was going to jail." He also stated the M.P. "has never done anything like that ever" and believed that M.P. had been joking around with his girlfriend.

{¶22} Next, defense counsel asked appellant about the officer's testimony that the house smelled like marijuana. Appellant said he does not know why the officer thought that, that "[i]t certainly wasn't me," and "[w]e weren't in the house that night smoking marijuana for sure."

{¶23} Appellant also maintained that he taught L.P. and M.P. how to handle guns in a safe manner. He further stated that he usually does not have loaded guns in the gun cabinet, but "there

had been some crazy stuff going on in my neighborhood and people [were] trying to break in houses," so he had kept three weapons loaded.

{¶24} Appellant testified that the night E.S. stayed at his house, he prepared dinner for the boys. After, "they went on about their time and [were] in the living room playing video games." Appellant explained he "was in [his] bedroom playing [his] guitar" until around 11:45 pm., then around that time he "yelled at [the boys] for being too loud." He told them it was "time to quiet down" and he returned to his room.

{¶25} The next thing appellant remembered is hearing "what sounded like a flat board falling on the table." He "jumped up to go find out what it was," and M.P. and L.P. met him in the hallway and told him what happened. Appellant tried to give E.S. CPR.

{¶26} Appellant explained that he wondered how M.P. obtained access to the gun because he kept the gun cabinet "locked all the time." Appellant initially assumed he left the cabinet unlocked because he thought only he knew the code. He also testified that he "put that lock on [the cabinet] religiously. Every time. Without fail."

{¶27} On cross-examination, the prosecutor asked appellant "[h]ow many times" he disciplined the boys that night.

Appellant stated that he "scolded them for not listening and not doing what they were told."  Appellant agreed that he did not know that L.P. and E.S. had lit M.P. on fire, even though the boys' rooms are five or six feet away from his room.  He also did not know of the video "in which L.P. told E.S. to kill himself."

{¶28}  Appellant did admit that he smoked marijuana a day or two before the fatal accident, but denied he smoked marijuana the night of the accident.  The prosecutor asked appellant if he takes suboxone, and appellant stated that he does on occasion.  He explained that "[a]t one point I was addicted to Roxy 30's."  The prosecutor also asked appellant about L.P.'s testimony that appellant showed the three boys a handgun during the evening of March 5, 2021, and appellant agreed that he had shown the boys one gun, but he believed this occurred on a preceding day.

{¶29}  On February 25, 2022, the jury found appellant guilty of involuntary manslaughter and endangering children.  The trial court merged the endangering children offense with the involuntary-manslaughter offense and sentenced appellant to serve four to six years in prison.  This appeal followed.

I

{¶30}  In his first assignment of error, appellant asserts that the state failed to present sufficient evidence to support

his two convictions.  In particular, he asserts that the state failed to establish that appellant's conduct proximately caused E.S.'s death, or that he committed a felony offense by leaving his gun cabinet unlocked.  Regarding proximate cause, appellant argues that the state failed to prove "but for" causation. Appellant argues that M.P. admitted that he knew the code to the gun cabinet, and, in the past, had opened it several times without permission.  Appellant thus asserts that, even if he forgot to lock the cabinet, M.P. "might still have entered the cabinet, removed a gun, and accidentally squeezed the trigger." Appellant further contends that his conduct did not constitute a substantial factor in bringing about E.S's death, but rather M.P.'s conduct was the substantial factor.  Appellant also argues that E.S.'s death was not a foreseeable risk.

{¶31}  The state responds that E.S.'s death was a proximate cause of appellant committing, or attempting to commit, the felony offense of endangering children.  The state contends that, if appellant had not "been in his bedroom with the door shut the whole time, talking to the minor children instead of texting them, and safely securing loaded firearms in his home, E.S. may still be here today."  The state further argues that "Appellant created the risk of E.S. being shot when he failed to properly secure loaded firearms in his home when children are

present or likely to be present." With respect to whether E.S.'s death was a foreseeable risk, the state asserts that "it is foreseeable that inquiring children would want to look and touch a firearm that was readily accessible to them – especially to show off the new laser [sight] and flashlight that [a]ppellant had put on."

A

{¶32} A claim of insufficient evidence invokes a due-process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *accord State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 13 ("[i]f the state fails to present sufficient evidence on every element of an offense, then convicting a defendant for that offense violates the defendant's right to due process of law"). When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins* at syllabus. The essential question is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential

elements of the offense beyond a reasonable doubt. *E.g., Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991).

{¶33} Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring); *accord State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. Instead, the factfinder's role is to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *accord State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16.

{¶34} Thus, when reviewing a sufficiency of the evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *E.g., State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484,

739 N.E.2d 749 (2001). Furthermore, "[w]hether the evidence is legally sufficient to sustain a verdict is a question of law" that appellate courts review de novo. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 3; *accord Thompkins*, 78 Ohio St.3d at 386.

B

**{¶35}** R.C. 2903.04(A) sets forth the offense of involuntary manslaughter: "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A).

**{¶36}** In the case sub judice, the state alleged that E.S.'s death was a proximate result of appellant's committing, or attempting to commit, the felony offense of endangering children, in violation of R.C. 2919.22(A) which provides:

> (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

R.C. 2919.22(A).

**{¶37}** Here, appellant did not present any argument focused around the elements contained in the endangering children statute. Instead, at the end of the argument in his first assignment of error appellant summarily asserts that he "did not

ATHENS, 22CA2

commit a felony offense by leaving his gun cabinet unlocked." Because appellant did not present an argument centered upon the elements contained in the endangering children statute, we should not create one. Rather, we simply note that the state presented more than adequate evidence to demonstrate that appellant created a substantial risk to the health or safety of E.S. (and appellant's two sons) by violating a duty of care, protection, or support by failing to ensure that the children did not have access to the loaded guns stored in his home, or by failing to properly supervise the children to ensure that they did not access the loaded weapons. Instead, appellant's argument within his first assignment of error focuses upon whether sufficient evidence demonstrates that E.S.'s death was a proximate result of appellant committing the felony offense of endangering children.

{¶38} Under well-established criminal law principles, causation consists of both actual cause and proximate cause.[2]

---

[2] Both appellant and the state assert that proving the "proximate result" standard in the involuntary manslaughter statute is equivalent to "proximate cause" and requires the state to establish both causation and foreseeability.

The Ohio Supreme Court has equated "proximate result" in the involuntary manslaughter statute with "proximate cause." *State v. Crawford*, 169 Ohio St.3d 25, 2022-Ohio-1509, 201 N.E.3d 840, ¶ 15, citing *State v. Carpenter*, 2019-Ohio-58, 128 N.E.3d 857, ¶ 51 (3d Dist.), and *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, 166 N.E.3d 1142, ¶ 9. In *Crawford*, the court stated that R.C. 2903.04(A) "requires two things for an

*State v. Carpenter*, 2019-Ohio-58, 128 N.E.3d 857, ¶ 51 (3d

Dist.), citing *Burrage v. United States*, 571 U.S. 204, 210, 134

S.Ct. 881, 187 L.Ed.2d 715 (2014) ("[w]hen a crime requires 'not

merely conduct but also a specified result of conduct,' a

defendant generally may not be convicted unless his conduct is

---

involuntary manslaughter conviction: (1) that a felony was committed, and (2) that a person's death was a proximate result of the commission of that felony." *Id.* at ¶ 14. Respecting proximate cause, the court announced that "the 'basic question that a proximate cause requirement presents'" is "'"whether the harm alleged has a sufficiently close connection to the conduct" at issue.'" *Id.* at ¶ 16, quoting *Robers v. United States*, 572 U.S. 639, 645, 134 S.Ct. 1854, 188 L.Ed.2d 885 (2014), quoting *Lexmark Internatl., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). The court further emphasized that "[t]he foreseeable harm is what matters for proximate cause." *Id.*, citing *Johnson v. Univ. Hosps. of Cleveland*, 44 Ohio St.3d 49, 57, 540 N.E.2d 1370 (1989).

It is unclear whether the *Crawford* court intended to overrule Ohio appellate decisions stating that the involuntary manslaughter statute requires both actual cause and proximate cause. *E.g.*, *Carpenter* at ¶ 51; *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 71; *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 36. The court appears, however, to have limited its decision to the specific predicate offense involved in that appeal (having a weapon while under a disability) and considered a pure question of law. *Crawford* at ¶ 17. Moreover, the court noted that the defendant conceded the proximate-cause issue. *Id.*

Additionally, neither the state nor appellant has argued that proximate cause involves only a foreseeability inquiry. Also, the Ohio Supreme Court issued *Crawford* a few months after appellant's trial concluded. Thus, we will consider the issue as the parties have presented it. *But see* Bacon, *State v. Crawford* 2022-Ohio-1509, 49 Ohio N.U.L.Rev. 489, 501 (2023) ("[t]he court's holding in *Crawford* has diluted foundational elements of criminal law and culpability").

'both (1) the actual cause, and (2) the "legal" cause (often called the "proximate cause") of the result.'"), quoting 1 Wayne R. LaFave, Substantive Criminal Law, Section 6.4(a), at 464-466 (2d Ed.2003); *State v. Lovelace*, 137 Ohio App.3d 206, 216, 738 N.E.2d 418 (1st Dist.1999); Baldwin's Oh. Prac. Crim. L., Section 96:1 (3d ed.) ("[t]here are two requirements for criminal culpability: (1) factual causation and (2) legal (proximate) causation").

**{¶39}** Additionally, Ohio appellate courts routinely state that "[t]he term 'proximate result' in the involuntary manslaughter statute involves two concepts: causation and foreseeability." *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 71; *e.g., State v. Williams*, 7th Dist. Columbiana No. 19 CO 0010, 2020-Ohio-4430, ¶ 35 ("Ohio courts regularly conclude the 'proximate result' language in the involuntary manslaughter statute requires the state to show: (1) actual cause, generally through the but-for test; and then, (2) legal cause, through the foreseeability test").

**{¶40}** In general, to "cause" another person's death means to commit "an act or failure to act which in a natural and continuous sequence directly produces the death of a person, and without which, it would not have occurred." *State v. Price*, 162

Ohio St.3d 609, 2020-Ohio-4926, 166 N.E.3d 1155, ¶ 33.
Moreover, "[c]onduct is the cause of a result if it is an event, but for which the result in question would not have occurred." *Id.* Taken together, these two principles mean that a homicide defendant's conduct ordinarily must be "the but-for cause of" the person's death. *Id.*

{¶41} When, however, one or more causes contribute to a person's death, the existence of other causes does not negate the defendant's conduct so long as the defendant's "act or failure to act was one cause." *Id.* at ¶ 34. In these circumstances, the defendant's "act or omission can be considered a cause in fact if it was a 'substantial' or 'contributing' factor in producing the result." *Carpenter* at ¶ 52 (citations omitted). In other words, "[t]here is no but-for cause of harm when independently sufficient causes of that harm coincide." *Price* at ¶ 29. Thus, "a defendant can still be held criminally responsible where the defendant's conduct combined with other occurrences to jointly result in a legal injury." *Hall* at ¶ 72; *accord State v. Motley*, 2023-Ohio-1811, 216 N.E.3d 761, ¶ 25 (8th Dist.), quoting *State v. Flanek*, 8th Dist. Cuyahoga No. 63308, 1993 WL 335601, *7 (Sept. 2, 1993) ("'[a] defendant cannot be relieved of criminal liability merely because factors other than his acts contributed to the death'");

*State v. Dunham*, 5th Dist. Richland No. 13CA26, 2014-Ohio-1042, ¶ 48 (cause in fact may be established by proof "that the conduct is a substantial factor in bringing about the injury").

{¶42} In the case sub judice, we agree with the state that appellant's conduct constituted a substantial or contributing factor in bringing about E.S.'s death. Appellant left his gun cabinet unlocked with loaded weapons inside. Appellant left his two sons and E.S. largely unsupervised during the evening without ensuring that they would be unable to access loaded weapons in the gun cabinet. Instead, appellant chose to remain in his bedroom throughout the evening, but did exit one time to ask the children to stop making noise. Had appellant kept watch of the children, or had he locked his gun cabinet and ensured the children did not have access to loaded weapons, M.P. could not have retrieved the loaded gun that ended with a fatal tragedy. Thus, appellant's conduct was a substantial factor in causing E.S.'s death. *See Hall* at ¶ 74 (concluding that mother's decision to leave her children home alone was a substantial factor in causing the children's death from house fire; if mother had been home rather than out all night, she may have been able to protect the children).

{¶43} Consequently, after our review we believe that the state presented sufficient evidence to show that appellant's

conduct, or his failure to act, constituted a cause of E.S.'s death.

2

{¶44} We further believe that the record contains sufficient evidence to establish that appellant's conduct, or failure to act, was a proximate cause of E.S's death. "[T]he 'basic question that a proximate cause requirement presents'" is "'"whether the harm alleged has a sufficiently close connection to the conduct" at issue.'" *Crawford*, *supra*, at ¶ 16, quoting *Robers*, 572 U.S. at 645, quoting *Lexmark*, 572 U.S. at 133. "The foreseeable harm is what matters for proximate cause." *Id.*, citing *Johnson*, 44 Ohio St.3d at 57; *accord State v. Bacon*, 6th Dist. Lucas No. L-14-1112, 2016-Ohio-618, ¶ 83 ("Proximate cause has been defined as '"a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience."'"), quoting *State v. Burt*, 8th Dist. Cuyahoga No. 99097, 2013-Ohio-3525, ¶ 23, quoting *State v. Muntaser*, 8th Dist. Cuyahoga No. 81915, 2003-Ohio-5809, ¶ 26-27. Thus, a defendant is "responsible for consequences which are direct, normal, and reasonably inevitable - as opposed to extraordinary or surprising - when viewed in the light of ordinary experience." *State v. Losey*, 23 Ohio App.3d 93, 95 (10th

Dist.1985). A "'defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct.'" *Id.*, citing *State v. Chambers*, 53 Ohio App.2d 266, 373 N.E.2d 393 (9th Dist.1977); *accord Carpenter* at ¶ 53; *State v. Sabo*, 3d Dist. Union No. 14-09-33, 2010-Ohio-1261, ¶ 25; Baldwin's Oh. Prac. Crim. L., Section 95:12 (3d ed.) ("where a person sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known at the time, the person is criminally liable for the direct and reasonably inevitable consequence of death resulting from the original criminal act").

{¶45} "A requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 444-45, 134 S.Ct. 1710, 188 L.Ed.2d 714 (2014), citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838-839, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996). "Even intervening criminal conduct does not prevent an offender's actions from being the proximate cause so long as that intervening conduct was foreseeable." *State v. Osman*, 4th Dist. Athens No. 09CA36, 2011-Ohio-4626, ¶ 48, citing *Lovelace*, 137

Ohio App.3d at 218-19 (police officer's criminal conduct during a high-speed chase, which directly caused a motorist's death, was foreseeable, and, therefore, defendant could be held criminally liable for proximately causing the motorist's death).

{¶46} Additionally, "'for something to be foreseeable does not mean that it be actually envisioned.'" *State v. Wells*, 12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, ¶ 35, quoting *Lovelace*, 137 Ohio App.3d at 219. As the *Losey* court explained:

> It is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct.

*Losey*, 23 Ohio App.3d at 96.

{¶47} In the case sub judice, even if appellant did not actually envision that M.P. would remove a loaded gun from the gun cabinet and shoot E.S., this result nonetheless is not so outside the realm of possibility that it could be viewed as an unforeseeable consequence of appellant leaving loaded weapons in an unlocked gun cabinet while leaving three adolescent boys, with obvious curiosity about weapons, largely unsupervised throughout the evening. Consequently, we believe that the state presented sufficient evidence to allow a reasonable factfinder to conclude that E.S.'s death was a foreseeable risk of appellant's act or failure to act. *See generally State v. Vogt*,

ATHENS, 22CA2

4th Dist. Washington No. 17CA17, 2018-Ohio-4457, ¶ 98 (even though death resulted from "the effects of taking multiple drugs" and experts could not "pinpoint which exact drug caused [the victim's] death, * * *  a fatal consequence was within the foreseeable scope of risk created by [the defendant's] conduct in administering the liquid methadone when there was ample evidence regarding [the victim's] inebriated condition, the fact that he and [the defendant] had taken other substances together that night, and the fact that [the defendant] had even warned [the victim] about using the liquid methadone").

{¶48}  Indubitably, E.S.'s death was a horrific accident. However, we nevertheless believe that the state presented sufficient evidence to establish, beyond a reasonable doubt, that appellant's actions caused E.S.'s death as a proximate result of committing the offense of endangering children. Proper precautions and the exercise of common sense would have prevented E.S.'s death.

{¶49}  Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

{¶50}  In his second assignment of error, appellant asserts that the trial court plainly erred by allowing the state to introduce irrelevant and highly prejudicial evidence.  Appellant

contends that the trial court plainly erred by failing to exclude the following evidence: (1) "[t]he video of [L.P.] repeatedly encouraging [E.S.] to kill himself"; (2) "[t]estimony about the smell of marijuana at the house"; (3) "[t]estimony about [M.P.] vaping underage and making comments about dabs – a THC compound that can be used to get high"; (4) "[t]estimony and exhibits of additional inoperable weapons that were kept in [M.P.'s] and [L.P.'s] rooms"; (5) "[t]estimony about [appellant's] marijuana use and his previous opiate addiction"; and (6) "[o]pinion testimony from Chief Fitch."[3]  Appellant argues that this evidence was irrelevant to proving a fact in issue.

{¶51}  Appellant contends that the two actions of consequence involved (1) M.P. taking a gun from the gun cabinet and accidentally shooting E.S., and (2) whether appellant left the gun loaded and unsecured in the gun cabinet.  Appellant argues that none of the foregoing evidence is relevant to show the existence of either fact and the danger of unfair prejudice substantially outweighed any probative value.

---

[3] Although appellant cited to the parts of the record to support this and other assignments of error, as App.R. 16(A)(7) requires, those page references do not match the page numbers in the transcripts provided to this court.  Nonetheless, this court has endeavored to review the entire record and appellant's assignments of error.

ATHENS, 22CA2

{¶52} The state argues that appellant failed to object to the testimony, and he even introduced some of it through his own testimony. The state further contends that the evidence "was cumulative in proving that [a]ppellant violated a duty of care when he permitted E.S. to spend the night at his home with his children." The state also asserts that the evidence was material to prove the endangering children offense:

> Evidence of whether Appellant's child is repeatedly telling another to kill himself, smoking illegal narcotics in the home – including Appellant previously using narcotics while owning a firearm – and the existence of multiple other weapons readily accessible, are relevant in whether or not Appellant had violated a duty of care or protection by creating a substantial risk to the health or safety of not only his own children, but one that he accepted care for that night.

The state also contends that the evidence was not unduly prejudicial. Instead, the state argues that the evidence helped tell the story of the day and "what led to M.P. obtaining the loaded firearm from the unlocked gun cabinet." Moreover, the state asserts that the evidence helped to establish that appellant violated the standard of care through his lack of control over the children's activities: "But for Appellant's lack of care, his loaded firearm would not have been retrieved by his fourteen-year-old son from an unlocked gun cabinet and E.S. might still be alive today."

A

{¶53} We initially observe that appellant did not object at trial to any of this evidence.  A well-established principle is that appellate courts ordinarily will not consider any error that a complaining party "could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."  *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus.  Appellate courts, nevertheless, have discretion to consider "[p]lain errors or defects affecting substantial rights."  Crim.R. 52(B); *e.g., Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 27.  "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights," i.e., the trial court's error must have affected the outcome of the trial.  *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 62, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.  However, even when a defendant demonstrates that a plain error or defect affected his substantial rights, the Ohio Supreme Court has "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'"  *State v. Barnes*, 94 Ohio St.3d 21,

ATHENS, 22CA2

27, 2002-Ohio-68, 759 N.E.2d 1240, quoting *State v. Long*, 53
Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the
syllabus.

{¶54} In the case at bar, after our review we do not believe
that the trial court plainly erred by allowing the evidence to
be admitted at trial. Additionally, even if, for purposes of
argument, we agreed that the trial court plainly erred, we do
not believe that a manifest miscarriage of justice occurred.

B

{¶55} Evid.R. 401 defines relevant evidence as "evidence
having any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or
less probable than it would be without the evidence." Under
Evid.R. 402, "[a]ll relevant evidence is admissible, except as
otherwise provided." A trial court must, however, exclude
relevant evidence "if its probative value is substantially
outweighed by the danger of unfair prejudice, of confusion of
the issues, or of misleading the jury." Evid.R. 403. A trial
court has broad discretion to determine whether to exclude
evidence under Evid.R. 403(A), and "'an appellate court should
not interfere absent a clear abuse of that discretion.'" *State
v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216,

¶ 40, quoting *State v. Allen*, 73 Ohio St.3d 626, 633, 653 N.E.2d 675 (1995).

**{¶56}** Evid.R. 403(A) "manifests a definite bias in favor of the admission of relevant evidence, as the dangers associated with the potentially inflammatory nature of the evidence must substantially outweigh its probative value before the court should reject its admission." *State v. White*, 4th Dist. Scioto No. 03CA2926, 2004-Ohio-6005, ¶ 50.  Thus, "[w]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission." *State v. Lakes*, 2nd Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 22.

**{¶57}** We also recognize that, to some degree, all relevant evidence may be prejudicial in the sense that it "tends to disprove a party's rendition of the facts" and, thus, "necessarily harms that party's case." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23.  Evid.R. 403(A) does not, however, "attempt to bar all prejudicial evidence." *Id.*  Instead, the rules provide that only unfairly prejudicial evidence is excludable. *Id.*  " 'Evid.R. 403(A) speaks in terms of unfair prejudice.  Logically, all evidence

presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant.  It is only the latter that Evid.R. 403 prohibits.'"  *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 107, quoting *State v. Wright*, 48 Ohio St.3d 5, 8, 548 N.E.2d 923 (1990).

{¶58}  Thus, unfair prejudice "does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence."  *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir.1986); *accord State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 89.  Instead, unfairly prejudicial evidence is evidence that "might result in an improper basis for a jury decision."  *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3. Unfairly prejudicial evidence arouses the jury's emotions, "'evokes a sense of horror,'" or "'appeals to an instinct to punish.'"  *Id.*, quoting Weissenberger.  "'Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'"  *Id.*, quoting Weissenberger Thus, "[u]nfavorable evidence is not equivalent to unfairly prejudicial evidence."  *State v. Bowman*, 144 Ohio App.3d 179, 185, 759 N.E.2d 856 (12th Dist.2001).

{¶59} In the case at bar, we do not believe that the trial court plainly erred by failing to exclude the evidence as irrelevant. Instead, we agree with the state that some of the evidence helped establish that appellant violated a duty of care or protection by creating a substantial risk to the health or safety of the children.

{¶60} The video of L.P. encouraging E.S. to kill himself helped to establish that appellant was unaware of the events that unfolded in his home and did not maintain proper oversight of the boys. It also helped the state establish a time line of the events. *See generally State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 72 (evidence regarding lack of parenting "provided the context for the alleged crimes"); *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 113 (background information admissible "to make the actions of the participants understandable to the jurors" and observing that crimes do not occur "in a vacuum").

{¶61} The testimony regarding the smell of marijuana also tended to establish that someone inside the home may have been smoking marijuana the night of the accident. Evidence that someone may have smoked marijuana suggested either that (1) appellant smoked marijuana, which would suggest that he did not maintain sobriety while in charge of the three boys, or (2) one

of the boys smoked marijuana, which would tend to show that appellant did not maintain proper oversight over them.[4]

{¶62}  Moreover, on direct examination defense counsel asked appellant about the officer's testimony regarding the smell of marijuana.  Appellant denied that anyone had smoked marijuana in the home that night and stated that he does not know why one officer thought that the home smelled of marijuana.

{¶63}  The evidence that depicted M.P. vaping, and the testimony regarding "dabs," also formed part of the immediate background of the events of the evening.  *Diar* at ¶ 72; *Skatzes* at ¶ 113.  Additionally, during defense counsel's direct examination of appellant, counsel asked about M.P.'s text message referring to "dabs."  Appellant stated that M.P. likely was "joking around" and M.P. does not smoke marijuana.

{¶64}  The testimony about the boys' weapons and the photographs that showed swords and other weapons in the boys' bedroom likewise formed part of the immediate background of the crime.  The crime-scene photographs depicted the bedroom where the shooting occurred and the other bedroom where the boys had

---

[4] The record reveals that appellant had allowed a homeless person to sleep on his couch on the night of the accident.  No one has suggested that this homeless person may have smoked marijuana, however.

spent part of the evening.  *See State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 85 (photos relevant because "helped explain the testimony of police officers who * * * processed the crime scene"); *State v. Graham*, 8th Dist. Cuyahoga No. 109582, 2021-Ohio-3199, ¶ 40, citing *State v. Jalowiec*, 91 Ohio St. 3d 220, 230, 744 N.E.2d 163 (2001) ("Ohio courts have found that photographs may be used for a wide variety of purposes, including corroborating witness testimony, establishing the intent of the accused, and showing the nature and circumstances of the crime").

{¶65}  Furthermore, during his direct examination appellant discussed the weapons shown in the photographs and explained about the inoperable guns and dull swords.  Appellant stated that M.P. once had a sharp sword, but appellant took it away.

{¶66}  We also do not believe that testimony about appellant's previous opiate addiction, while of questionable relevance to the involuntary manslaughter charge, affected the jury's decision.  No evidence adduced at trial indicated that appellant had an on-going drug addiction issue.

{¶67}  Chief Fitch offered testimony to explain how he stores weapons in his home and this helped to establish whether appellant breached a duty of care or protection by his failure to ensure that the children did not have access to weapons.  The

chief's testimony gave the jury information regarding best practices to store weapons to minimize the likelihood that curious children could access the weapons. While we recognize that Ohio law does not require gun owners to store weapons in any particular manner, the chief's testimony helped the jury to understand how a parent could store weapons in order to reduce the risk that a curious child could find a weapon and cause an accident.

{¶68} Appellant nevertheless contends that, even if the evidence was relevant, such evidence was unfairly prejudicial and confused the jury. Appellant asserts that the video of L.P. telling E.S. to kill himself "only hours before" E.S.'s death was "morbid, evoke[d] a sense of horror, and serve[d] only to inflame the passions of the jury." As we stated above, however, the video helped to establish that appellant was unaware of the boys' activities throughout the evening, and it also formed part of the background of the crime and helped to establish a time line of the fatal shooting. The video, filmed only a few moments before M.P. shot E.S., did not serve only to evoke a sense of horror or to inflame the jury's passions.

{¶69} Appellant additionally alleges that evidence regarding marijuana, vaping, and appellant's former opiate addiction confused the jury. He points out that during certain witnesses'

testimony the jury asked questions about marijuana and dabs. Appellant suggests that this questioning shows that the evidence confused the jury. While we do not speculate why the jury asked questions about the smell of marijuana or dabs, we do not believe that the record supports a conclusion that the evidence confused the jury. Instead, the record reflects that the jury carefully deliberated the case. During deliberations, the jury requested to see various pieces of physical evidence, none of which related to marijuana, vaping, or appellant's former opiate addictions. The jury also sought clarification regarding the meaning of "cause" and "the length of time that continu[ous] sequence begins." The court advised the jury to consult the court's original instructions.

**{¶70}** Additionally, the jury later advised the court that it reached a decision regarding one count and "spent many hours deliberating the second without being able to make a conclusion." The court indicated that it would instruct "the bailiff or [his] staff to let [the jury] know to continue deliberating." The jury later returned its verdict. Thus, the record of the jury's deliberations shows that the jury diligently considered the matter before it reached a verdict and refutes appellant's argument about jury confusion.

ATHENS, 22CA2

**{¶71}** Appellant also argues that this drug-related evidence allowed the state to portray appellant and M.P. "as criminal drug users and invite[d] the jury to view them as such." He further contends that "evidence regarding the purely speculative possibility that [appellant] was under the influence of drugs" on the night of the accident "was more prejudicial than probative." As we noted earlier, however, evidence that appellant or M.P. (or one of the other boys) may have smoked marijuana on the night of the accident was relevant to show that appellant did not properly supervise the boys. We do not believe that the probative value of this evidence was substantially outweighed by its prejudicial effect. *See Yarbrough* at ¶ 40 ("the exclusion of relevant evidence under Evid.R. 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place").

**{¶72}** Appellant further claims that the state used the challenged evidence "to assert an absentee parent theory" when it, instead, "needed to prove access to the gun violated the standard of care." We observe, however, that the endangering-children statute required the state to establish that appellant created "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22(A). This statute required the state to demonstrate

that appellant created a substantial risk to E.S.'s health or safety by violating a duty of care, protection, or support. It did not necessarily require the state "to prove access to the gun violated the standard of care." Instead, the statute required the state to prove that appellant violated "a duty of care, protection, or support." The evidence the state introduced helped to illustrate that appellant violated a duty of care or protection by failing (1) to maintain proper oversight over the children throughout the night of the fatal accident, or (2) to ensure that the weapons were inaccessible and unloaded while three weapons-curious boys spent the night in his home. In sum, we do not believe that the trial court plainly erred by admitting the above evidence.

{¶73} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

### III

{¶74} In his third assignment of error, appellant asserts that the trial court plainly erred by allowing Chief Fitch to give expert-opinion testimony. In particular, he contends that the chief "testified to standards for firearm handling and safety – something within the purview of an expert." Appellant thus alleges that the state should have complied with Crim.R.

ATHENS, 22CA2

16(K) and the trial court should have excluded Fitch's testimony.

{¶75} The state contends that it did not ask Chief Fitch questions as an expert witness, but rather as a lay witness. The state additionally asserts that defense counsel not only failed to object to the chief's testimony, but also during cross-examination asked the chief questions about gun safety. The state observes that appellant used the chief's testimony to help argue that appellant did not commit a crime by failing to securely store his weapons. As the state also notes, appellant did not object to Chief Fitch's testimony. Thus, we review this assignment of error for plain error.

{¶76} Evid.R. 701 governs the admissibility of non-expert opinion testimony. The rule provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Evid.R. 701.

{¶77} Evid.R. 702 sets forth the requirements for expert testimony and provides:

> A witness may testify as an expert if all of the following apply:
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by

lay persons or dispels a misconception common among lay persons;

    (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

    (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

    (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

    (2) The design of the procedure, test, or experiment reliably implements the theory;

    (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

**{¶78}** In *State v. McKee*, the Ohio Supreme Court explained "[t]he distinction between lay and expert witness opinion testimony" as follows: "lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *State v. McKee*, 91 Ohio St.3d 292, 297, fn.2, 744 N.E.2d 737 (2001), quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn.1992); *accord State v. Lavender*, 1st Dist. Hamilton No. C-180003, 2019-Ohio-5352, 141 N.E.3d 1000, ¶ 95.

**{¶79}** In the case at bar, we do not believe that Chief Fitch's testimony constituted expert testimony. His testimony did not result "'from a process of reasoning which can be

mastered only by specialists in the field.'" *McKee*, 91 Ohio St.3d at 297, fn.2. Moreover, the chief's testimony did not relate "to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons." *Id.* Instead, the chief's testimony resulted from a reasoning process familiar in everyday life as a law enforcement officer and gun owner.

{¶80} Moreover, Ohio courts generally agree that a law enforcement officer may offer lay testimony "concerning matters that are within [the officer's] experience and observations" if otherwise admissible under Evid.R. 701. *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 108 (2nd Dist.), quoting *State v. Tatum*, 10th Dist. Franklin No. 10AP-626, 2011-Ohio-907, ¶ 17; *e.g., Lavender* at ¶ 110 (officer could offer lay testimony regarding "whether a particular picture contained an image of a revolver"); *State v. Blair*, 2016-Ohio-2872, 63 N.E.3d 798, ¶ 87-88, 96 (4th Dist.) (two officers' testimony that an individual did not have physical ability to beat the victim to death or inflict the type of wounds that would have been consistent with a fatal beating admissible as lay testimony); *Tatum* at ¶ 14 (officer's testimony that bullets fired into a victim's car originated from a large-caliber firearm admissible as lay testimony); *State v. Parker*, 2d Dist. Montgomery No. 18926,

2002-Ohio-3920, ¶ 53 (detective permitted to testify that two wounds on defendant consistent with gunshot wounds).

{¶81} Additionally, as we stated in *State v. Carver*, 4th Dist. Scioto No. 21CA3943, 2022-Ohio-3223, ¶ 56:

> "lay witness opinion testimony is not prohibited 'merely because it embraces the ultimate issue to be decided by the trier of fact.'" *State v. Infante*, 11th Dist. Trumbull No. 2019-T-0043, 2020-Ohio-992, at ¶ 42, quoting *State v. Heilman*, 11th Dist. Trumbull Nos. 2004-T-0133, 2004-T-0135, 2006-Ohio-1680, ¶ 96, citing Evid.R. 704. "[T]he critical point is whether the opinion of the lay witness will truly be helpful to the jury * * *." *State v. O'Brien*, 11th Dist. Lake No. 2011-L-011, 2013-Ohio-13, ¶ 45.

{¶82} In the case before us, we do not believe that the trial court plainly erred by permitting Chief Fitch to testify about his gun-safety or gun-storage practices. Instead, Fitch's testimony was (1) rationally based on his perception, and (2) helpful to a clear understanding of whether leaving loaded weapons in an unlocked gun cabinet created a substantial risk of harm to the three children spending the night in appellant's home.[5] We therefore do not agree with appellant that the state should have qualified the chief as an expert witness or that the

---

[5] We also note that information readily available on the National Rifle Association's website supports the view that the chief's testimony did not relate to matters beyond a lay person's understanding, and it contains a common-sense notion: "Store guns so they are not accessible to unauthorized persons, especially children." https://eddieeagle.nra.org/parents.

ATHENS, 22CA2

trial court plainly erred by allowing the testimony into evidence.

{¶83} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.

IV

{¶84} In his fourth assignment of error, appellant asserts that trial counsel did not provide effective assistance of counsel. In particular, appellant claims that trial counsel failed to object to irrelevant and prejudicial evidence, including questions asked to establish that M.P, L.P., and appellant "were irresponsible." More specifically, appellant claims that trial counsel was ineffective for failing to object to questions that the prosecution asked L.P. regarding: (1) the swords in L.P.'s room; (2) "when and why [L.P.] got in trouble with 'other weapons' and when he hit his brother with a stick once"; (3) "a recording [of] a video of [M.P.] vaping"; (4) "the firearm and BB gun in [L.P.]'s room"; (5) "when and why and how he and [E.S.] lit [M.P.] on fire"; (6) "when and why he used throwing stars in the house"; and (7) "when and why he took a picture with a BB gun in his mouth."

{¶85} Appellant further asserts that trial counsel was ineffective for failing to object to questions that the prosecution asked M.P. regarding: (1) "when and how much he

vaped"; (2) "whether he knew he was not old enough to vape"; (3) "a broken gun and a BB gun in his room"; (4) "when and how he was lit on fire by [E.S.] and [L.P.]"; (5) "[L.P.] and [E.S] snort chocolate milk powder"; (6) "using 'dabs,' what 'dabs' means, and whether you can get high from it"; and (7) "whether a video depicted him vaping."

{¶86} Appellant additionally contends that trial counsel was ineffective for the failure to object to questions that the prosecution asked Alexis Gogel regarding:  (1) "messages from [appellant] that a gun in the house belonged to [M.P.]"; (2) "messages from [appellant] saying 'No one is dead yet.  You know with my two boys it's possible"; (3) "messages about [L.P.] hitting [M.P.] with a stick and then swinging swords at him, and [M.P.] slapping [L.P.] back"; (4) "photos of [L.P.] with a BB gun in his mouth"; (5) "messages from [M,P.] stating [L.P.] and [E.S.] lit him on fire and snorted chocolate milk powder"; (6) "messages from [M.P.] about him vaping and using dabs"; (7) a video of [L.P.] repeatedly telling [E.S.] to kill himself"; and (8) a video of [M.P.] vaping in the house."

{¶87} Appellant further contends that trial counsel was ineffective for the failure to object to questions the prosecution asked Chief Fitch.  Appellant claims the following questions "were irrelevant and unduly prejudicial":  (1) "how

and why he stores his own firearms in large safes in his basement"; (2) "how his own son does not know the combination to his gun safes"; (3) "how his son took the Ohio Hunter's Safety Course"; (4) "where he keeps his firearms for use in home defense and that placement by the front door wouldn't make any sense"; (5) "how much firearm safety education is adequate"; (6) "[appellant] leaving a loaded firearm for his son to access"; (7) "how the safes he uses are appropriate for gun storage while the cabinet used by [appellant] was not secure"; (8) "which gun of [appellant's] would be adequate for home defense"; and (9) "how having guns in a visible location is irresponsible." Appellant contends that Fitch "opined as to his feelings on how [appellant] stored his firearms and insinuated [appellant']s children were not taught enough about firearm safety." Appellant alleges that Fitch's "testimony was not helpful to the jury in determining a fact in issue," so defense counsel should have objected.

{¶88} The Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance"

of counsel.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *accord Hinton v. Alabama*, 571 U.S. 263, 272, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014) (the Sixth Amendment right to counsel means "that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence").

{¶89}  To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial.  *E.g., Strickland*, 466 U.S. at 687; *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 183; *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 85.  "Failure to establish either element is fatal to the claim."  *State v. Jones*, 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14.  Therefore, if one element is dispositive, a court need not analyze both.  *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000) (a defendant's failure to satisfy one of the ineffective-assistance-of-counsel elements "negates a court's need to consider the other").

{¶90}  The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community:  'The proper measure of attorney

performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356, 366, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), quoting Strickland, 466 U.S. at 688; *accord Hinton*, 571 U.S. at 273. Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.'" *State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

{¶91} Furthermore, "'[i]n any case presenting an ineffectiveness claim, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."'" *Hinton*, 571 U.S. at 273, quoting *Strickland*, 466 U.S. at 688. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95 (citations omitted).

{¶92} Moreover, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Thus, "the defendant must overcome

the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *e.g., State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156, 524 N.E.2d 476 (1988).

**{¶93}** To establish prejudice, a defendant must demonstrate that a reasonable probability exists that "'but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome.'" *Hinton*, 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 694; *e.g., State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 91 (prejudice component

requires a "but for" analysis). "'[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Hinton*, 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 695. Furthermore, courts ordinarily may not simply presume the existence of prejudice but, instead, must require a defendant to affirmatively establish prejudice. *State v. Clark*, 4th Dist. Pike No. 02CA684, 2003-Ohio-1707, ¶ 22; *State v. Tucker*, 4th Dist. Ross No. 01CA2592, 2002 WL 507529 (Apr. 2, 2002); *see generally Roe v. Flores-Ortega*, 528 U.S. 470, 483, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2008) (prejudice may be presumed in limited contexts, none of which are relevant here).

**{¶94}** We note that trial counsel's "failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103; *accord State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 144 (rejecting argument that failing to preserve error is inherently prejudicial and stating, "[i]t is not enough that an alleged error resulted in a disadvantage for an accused"). Instead, a defendant still must "show that any particular failure to object substantially violated an[] essential duty [and] was prejudicial." *State v. Fears*, 86 Ohio St.3d 329, 347, 715

N.E.2d 136 (1999); *accord State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988) (stating that failure to object insufficient on its own to establish ineffective assistance of counsel; instead, a defendant still must demonstrate that counsel substantially violated an essential duty and that counsel's performance materially prejudiced the defense).

{¶95} Additionally, trial counsel's decision to object, or not to object, may be a legitimate trial strategy or tactical decision for the reason that "'each potentially objectionable event could actually act to [the defendant]'s detriment.'" *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (C.A.6, 2006). Thus,

> "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*Johnson* at ¶ 140, quoting *Lundgren*, 440 F.3d at 774; *cf. United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (describing the right to the effective assistance of counsel as "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing").

{¶96} In the case at bar, we do not believe that any single failure to object essentially defaulted the case to the state, or that defense counsel consistently failed to use objections, despite numerous and clear reasons for doing so, such that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice. First, as we noted in our discussion of appellant's second assignment of error, some of the testimony that appellant now challenges was relevant. Second, to the extent any of the other testimony listed within this assignment of error could be viewed as not relevant had trial counsel objected, the trial court would have had discretion to admit the testimony.

{¶97} Furthermore, we do not believe that counsel's failure to object to any purportedly irrelevant evidence affected appellant's substantial rights. Without the purportedly irrelevant evidence, the remaining evidence firmly establishes that appellant caused E.S.'s death as a proximate result of committing the offense of endangering children. Even if we excised every piece of testimony appellant references within this assignment of error, the remaining evidence establishes that (1) appellant stored loaded guns in an unlocked gun cabinet accessible to the children, (2) appellant knew his children and E.S. had an interest in weapons, (3) according to L.P.'s

testimony, on the date of the fatal accident appellant had shown the three boys a "pistol," and (4) appellant spent most of the night of the fatal accident in his bedroom. Thus, appellant generally was unaware of the children's activities. This evidence constitutes more than adequate evidence that appellant's actions and inactions caused E.S.'s death as a proximate result of committing endangering children.

{¶98} While we do not doubt, and actually readily accept, the fact that appellant profoundly regrets the fatal accident, the evidence nevertheless supports the jury's verdict that he caused E.S.'s death as a proximate result of endangering children. Consequently, even if we excise the purportedly irrelevant evidence, we believe the remaining evidence supports appellant's conviction. As a result, even if trial counsel's failure to object to the litany of testimony cited above constituted deficient performance, that performance did not affect appellant's substantial rights, i.e., it did not affect the outcome of the trial.

{¶99} Additionally, after our review we do not believe that the record otherwise suggests that trial counsel deprived appellant of the effective assistance of counsel. Trial counsel raised objections as counsel deemed appropriate and based upon trial strategy. Had counsel objected to every piece of

ATHENS, 22CA2

testimony cited in appellant's fourth assignment of error, counsel would have needlessly interrupted the flow of the trial and the jury may have perceived the objections as bothersome. *See State v. Campbell*, 69 Ohio St.3d 38, 53, 630 N.E.2d 339 (1994) ("[b]ecause '[o]bjections tend to disrupt the flow of a trial, [and] are considered technical and bothersome by the fact-finder,' Jacobs, Ohio Evidence (1989), at iii-iv, competent counsel may reasonably hesitate to object in the jury's presence"). Trial counsel reasonably could have determined that objecting to each and every item of testimony cited in appellant's fourth assignment of error, for a total of 31 objections, would have been unreasonable and may have portrayed counsel in a negative light. *See generally Engle v. Isaac*, 456 U.S. 107, 134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) ("the Constitution does not insure that defense counsel will recognize and raise every conceivable * * * claim").

{¶100} Moreover, "[e]ven if defense counsel did not perform as perfectly as appellant would have preferred, the Sixth Amendment right to counsel does not guarantee an error-free, perfect trial, but simply, a fair trial, i.e., one whose result was reliable." *State v. Carroll*, 4th Dist. Ross No. 15CA3506, 2016-Ohio-7218, ¶ 35, citing *In re Smith*, 4th Dist. Ross No. 01CA2599 (Dec. 12, 2001), quoting *United States v. Hasting*, 461

U.S. 499, 508-509, 103 S.Ct. 1974 (1983)("'there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'"); *cf. Cronic*, 466 U.S. at 659 (explaining that trial is unfair "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing").

{¶101} We further note, as does the state, that trial counsel successfully (1) convinced the trial court to dismiss the firearm specifications, and (2) sought a jury instruction to advise the jury that Ohio law does not require gun owners to store their guns in any particular manner. The court instructed the jury that "[t]here is no criminal statute in Ohio that prescribes how a gun owner must store a loaded or unloaded firearm and/or ammunition in the home as it relates to a minor's access thereto."

{¶102} Therefore, based upon all of the foregoing reasons, we do not agree with appellant that trial counsel failed to provide effective assistance of counsel. *See generally Cronic*, 466 U.S. at 656 (footnote omitted) ("[w]hen a true adversarial criminal trial has been conducted — even if defense counsel may have made demonstrable errors — the kind of testing envisioned by the Sixth Amendment has occurred"). Accordingly, we overrule appellant's fourth assignment of error.

V

{¶103} In his fifth assignment of error, appellant asserts that the cumulative effect of the errors deprived him of a fair trial.

{¶104} The cumulative-error doctrine states that a conviction will be reversed if the cumulative effect of all the errors in a trial deprive a defendant of the constitutional right to a fair trial, even though each alleged instance of error may not individually constitute cause for reversal. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶105} In the case before us, however, because we have not found merit to appellant's assignments of error, the cumulative-error doctrine does not apply under these circumstances. *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 143, citing *Powell* at ¶ 223.

{¶106} Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.

VI

{¶107} In his sixth assignment of error, appellant asserts that the trial court erred by sentencing him to an indeterminate

ATHENS, 22CA2

term of imprisonment.[6]  He claims that the Reagan Tokes Law, R.C.

2929.144(B), is unconstitutional because the law violates the

separation-of-powers doctrine, the constitutional right to due

process, and the constitutional right to a jury trial.

{¶108} We believe that our recent analysis in *State v.*

*Nesbitt*, 4th Dist. Ross No. 23CA14, 2023-Ohio-3434, fully

disposes of appellant's sixth assignment of error.  We therefore

incorporate the relevant portion below:

> "'[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.'"  *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15, quoting *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986).  A reviewing court does have "discretion to consider a forfeited constitutional challenge to a statute" and "may review the trial court decision for plain error, but we require a showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." (Citation omitted.)  *Id.* at ¶ 16.  "The burden of demonstrating plain error is on the party asserting it." *Id.*  The Supreme Court of Ohio has "stated that a forfeited constitutional challenge to a statute is subject to review 'where the rights and interests involved may warrant it.'"  *Id.*, quoting *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus.

---

[6] During the pendency of this appeal, the trial court granted appellant judicial release.  Appellant's judicial release does not render this appeal moot because the trial court reserved the right to reimpose appellant's sentence if he violates his community-control conditions.  *See State v. Delmonico*, 8th Dist. Cuyahoga No. 108578, 2020-Ohio-3368, ¶ 30, fn.6; *State v. Cossin*, 4th Dist. Athens No. 02CA32, 2003-Ohio-4246, ¶ 8.

Nesbitt did not argue plain error on appeal, and we decline to construct a plain error argument on his behalf. *State v. Conant*, 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, at ¶ 40 (declining to construct plain error argument for appellant challenging Reagan Tokes Law). However, we observe that even if Nesbit had argued plain error, his argument would fail. Nesbitt asserts the Reagan Tokes Law violates the right to a jury trial and separation-of-powers doctrine, but in *State v. Hacker*, ___ Ohio St.3d ___, 2023-Ohio-2535, ___ N.E.3d ___, the Supreme Court of Ohio recently held that the law does not violate the right to a jury trial or the separation-of-powers doctrine. *Hacker* at ¶ 1, 25, 28. "An appellate court has no authority to overrule decisions of the Ohio Supreme Court but is bound to follow them." *State v. Dickens*, 9th Dist. Lorain No. 07CA009218, 2008-Ohio-4404, ¶ 25.

Nesbitt also asserts that the Reagan Tokes Law violates the right to due process under the Fourteenth Amendment. He claims that the law "does not give adequate notice of what will trigger additional prison time" because R.C. 2967.271(C) is unconstitutionally vague regarding what institutional rule infractions DRC may use to rebut the R.C. 2967.271(B) presumption of release. However, Hacker held that the Reagan Tokes Law is not void for vagueness. *Hacker* at ¶ 40. Nesbitt also claims the Reagan Tokes Law "does not provide a process for a fair hearing" when rule infraction "charges are brought." He asserts that under Ohio Adm.Code 5120-9-08, a panel of two DRC staff members has authority to determine guilt, the panel has "ultimate authority" to grant or deny requests for witnesses, and if the panel grants a request, the inmate "may not address or examine a witness" and "is only permitted to ask the panel to pose questions to the witness." However, Hacker determined that the Reagan Tokes Law does not violate procedural due process on its face. *Hacker* at ¶ 1, 35-40.

*Id.* at ¶ 52-54.

{¶109} Accordingly, based upon the foregoing reasons, we overrule appellant's sixth assignment of error and affirm the trial court's judgment.

ATHENS, 22CA2

JUDGMENT AFFIRMED.

ATHENS, 22CA2

Smith, J., Dissenting

**{¶110}** I respectfully dissent with the majority's disposition of assignments of error one through five and I would not reach the merits of assignment of error six.  With respect to Platt's first assignment of error, which challenges the sufficiency of the evidence as to both his child endangerment and involuntary manslaughter convictions, the majority holds that Platt's conduct "constituted a substantial or contributing factor in bringing about E.S.'s death."  The majority cites several reasons in support of its holding, including that Platt left his gun cabinet unlocked with loaded weapons inside and that Platt left his two sons and E.S. "largely unsupervised during the evening without ensuring that they would be unable to access loaded weapons in the gun cabinet."  The majority finds that if Platt had "kept watch of the children, or had he locked his gun cabinet and ensured the children did not have access to loaded weapons, M.P. could not have retrieved the loaded gun that ended with a fatal tragedy."  Based upon this reasoning, the majority finds that Platt's "conduct was a substantial factor in causing E.S.'s death."  However, because the record before us indicates that M.P. had somehow obtained the security code for the gun safe, unbeknownst to Platt, I cannot agree with the conclusion E.S. may still be alive but for Platt's failure to lock his gun

cabinet, which contained a loaded firearm. Furthermore, if we are to accept Chief Fitch's testimony, which I believe was improperly admitted, Platt was rendered guilty of child endangerment simply by choosing to store his weapons in a gun cabinet as opposed to a gun safe, whether the cabinet was locked or not. Such reasoning simply cannot stand, as the State of Ohio has not enacted a safe storage law. For these reasons, I disagree with the majority's disposition of Platt's first assignment of error.

{¶111} I further find that Platt's second, third, fourth, and fifth assignments of error should be sustained. Although I am mindful that plain error should be noticed " ' with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice[,]' " I conclude that the trial court's admittance of voluminous irrelevant and unduly prejudicial testimony and evidence, even in the absence of objections by defense counsel, constituted plain error. *State v. Barnes*, supra, at 27, quoting *State v. Long*, supra, at paragraph three of the syllabus. Although there is evidence in the record to indicate that Platt was home with his children all evening on the night of the incident, that he had prepared dinner for them, had scolded them at least once, and possibly twice, in person for being too loud or rowdy, that he had

ATHENS, 22CA2

educated his sons on gun safety, and that he almost always stored his guns unloaded in a locked gun cabinet with a combination lock that he believed was only known to himself, this evidence was overcome by irrelevant and unduly prejudicial evidence that portrayed Platt as an absent and formerly drug-addicted parent who failed to supervise the children that were in his home and who irresponsibly left a loaded weapon is his unlocked gun cabinet, that was merely for display or decoration and that could not be considered secure, even if locked.

{¶112} For instance, the trial court admitted and defense counsel failed to object to testimony suggesting that either Platt or the children had smoked marijuana that night, despite the fact that only one of several responding officers noted a smell of marijuana, that no marijuana was recovered from the house, and that it was never established that Platt or any of the children had used marijuana that night. Evidence of Platt's prior drug addiction and use of suboxone was also admitted without objection, which I conclude was not only irrelevant to the present matter as it was removed in time, but was also unduly prejudicial. I find there is no plausible trial strategy which supports the failure to object to these lines of questioning and further find that the trial court's admittance of this testimony constituted plain error. The admission of

this evidence, even if deemed relevant, most surely was outweighed by the danger of unfair prejudice and confusion of the jury.

{¶113} As noted by the majority, "[u]nfairly prejudicial evidence arouses the jury's emotions, ' "evokes a sense of horror," ' or ' "appeals to an instinct to punish." ' " *Oberlin v. Akron Gen. Med. Ctr*, supra, at 172, quoting Weissenberger's Ohio Evidence, supra, at 85-87, Section 403.3. As further observed by the majority, " ' "unfairly prejudicial evidence appeals to the jury's emotions rather than intellect." ' " Id. The testimony regarding suspected, current marijuana usage and prior drug abuse went far beyond attempting to demonstrate that Platt violated a duty of care by creating a substantial risk to the health and safety of the children. Instead, in my view, it served to evoke a sense of horror and inflame the jury's passions, as argued by Platt.

{¶114} Additionally, I find the allowance of what essentially purported to be expert testimony by Chief Fitch as to the standards for safe gun storage to be highly and unfairly prejudicial. The state offered Chief Fitch's testimony not as a layperson, but as a law enforcement officer with prior experience working for the Bureau of Criminal Investigation, to provide the standard for what constitutes responsible gun

ATHENS, 22CA2

ownership and safe storage, in comparison to the practices of

Platt, which in Chief Fitch's view fell well below his

articulated standard. I find defense counsel was ineffective

for failing to object to this testimony in general and also find

that the trial court plainly erred in admitting this testimony

to the extent the state did not comply with the requirements for

qualifying the witness as an expert in accordance with Crim.R.

16(K).

**{¶115}** Chief Fitch was permitted to testify at length

regarding his personal practice with handling and storing

firearms as compared to how Platt's weapons were kept and stored

in his home. Chief Fitch essentially testified that the only

responsible way in which individuals, and particularly parents,

can possess and store firearms is if their child is educated on

gun safety, is shown how to handle firearms, and understands

that if they have any questions about a firearm at any given

moment, the adult owner will stop what they are doing and

immediately address those questions so as to eliminate any

curiosity whatsoever. Chief Fitch was further permitted to

criticize Platt's election to store his guns in a gun cabinet as

opposed to a gun safe, opining that the former is essentially

only for decoration and display, while the latter is the only

responsible option for safety and security. Chief Fitch was

also permitted to opine and criticize Platt's decision to store his firearms in a gun cabinet located near the front door, essentially suggesting that to do so endangered rather than protected the family against intruders, as an intruder would have quick access to the guns when they entered the door. All of this served to portray Platt at best as an ignorant and irresponsible gun owner, despite the fact that Platt testified and M.P. verified that he had educated his children on firearm safety, had taught them that every gun should be presumed loaded, that it was his routine practice to store his firearms unloaded in the locked gun cabinet, except that he recently left his gun loaded due to a rash of nearby break-ins and had apparently forgotten to lock the cabinet the previous time he opened it. Further, the fact that M.P. had apparently gained access to the combination lock on the cabinet coupled with the fact that M.P. admitted to having accessed the cabinet on several previous occasions without permission in the past, begs the question as to whether it was Platt that left the gun cabinet unlocked after all.

{¶116} Additionally, as mentioned above, according to Chief Fitch, the storing of firearms in a gun cabinet, even if locked, is insufficient because a gun cabinet has glass doors and is simply for "aesthetics." According to Chief Fitch, the only

ATHENS, 22CA2

responsible way to store guns is the way he stores them, which is in an immovable fire-rated gun safe, with the combination code kept under separate lock and key in a "safety deposit box." The problem with this is that Ohio has never enacted a safe storage law with respect to firearms.  I will concede that defense counsel attempted to draw out this point on cross-examination, however, as is illustrated below, counsel was unable to undo the damage done by allowing Chief Fitch to testify, essentially as an expert, to a standard which simply does not exist in the State of Ohio.  This exchange took place as follows between defense counsel and Chief Fitch during cross examination:

Q:   Uh, do you do those things because that is what you want to do or do you do those things because it's your  understanding that's required by law?

A:   Uh, I do those things because I believe it's a responsible  thing to do as a homeowner.

Q:   Okay. But not required by law?

A:   Well I feel that I am responsible as a gun owner and     required by law to keep those guns.

Q:   Okay

A:   And not just leave them laying around for guests or     company to come over and have access to them.

Q:  Okay.  But again, none of those steps are required by law?

ATHENS, 22CA2

A:   Again, I would say that being a responsible gun owner and  keeping them out of the hands of people into my house is  required by law.

Q:   Okay.

A:   If I own a firearm I am responsible for that by law.

Q:   Okay.

A:   So yes I would disagree with that statement.

{¶117} Then, on re-direct, the state asked Chief Fitch whether or not there was a latch on Platt's gun cabinet, to which Fitch responded in the affirmative, stating that it could have "theoretically" been used to lock the gun cabinet. However, the state was permitted to further question the chief, without objection, whether Platt's gun cabinet was secure, to which the chief responded "[a]bsolutely not."

{¶118} Although the state argues that Platt "was not charged with a crime that involved the manner in which he stored his firearms nor the fact that he kept loaded firearms in his home," in my view, the allowance of Chief Fitch's testimony, which was for all intents and purposes testimony of an unvetted expert witness, essentially put Platt on trial for storing loaded firearms in a cabinet deemed by Fitch to be unsecure.  Thus, although defense counsel was clearly trying to reframe Chief Fitch's testimony for Platt's benefit, his questioning regarding the proper and responsible method of storing guns only further

ATHENS, 22CA2

harmed Platt's interests.  As such, I believe counsel's representation fell below an objective standard of reasonableness in this regard and resulted in not only deficient performance, but prejudice to his client.

**{¶119}** In light of the foregoing, I would sustain Platt's first assignment of error, as well as his second, third and fourth assignments of error.  I would likewise sustain Platt's fifth assignment of error, which argues cumulative error as a result of the errors forming the basis of assignments of error one through four.  In short, I agree with Platt's argument that trial counsel performed deficiently and "profoundly disserved" him at trial.  Finally, in light of my disposition of assignments of error one through five, I would not reach the merits of Platt's sixth assignment of error.

ATHENS, 22CA2

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of 60 days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the 60-day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the 45-day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Wilkin, J.: Concurs in Judgment and Opinion.
Smith, P.J.: Dissents with Dissenting Opinion.

For the Court

BY:_____
                                    Peter B. Abele, Judge

NOTICE TO COUNSEL

ATHENS, 22CA2

     Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.